218 P.3d 180 (2009)
ABBEY ROAD GROUP, LLC, a Washington limited liability company; Karl J. Thun and Virginia S. Thun, husband and wife; Thomas Pavolka; and Virginia Leslie Revocable Trust; and William and Louise Leslie Family Revocable Trust, Petitioners,
v.
CITY OF BONNEY LAKE, a Washington municipal corporation, Respondent.
No. 80878-3.
Supreme Court of Washington, En Banc.
October 8, 2009.
*181 Loren Dee Combs, Gregory Francis Amann, VSI Law Group PLLC, Tacoma, WA, for Petitioners.
Jeffrey Ganson, Dionne & Rorick, Lisa M. Worthington-Brown, Attorney at Law, Seattle, WA, for Respondent.
Milton G. Rowland, Foster Pepper PLLC, Spokane, WA, Jeffrey Scott Myers, Law Lyman Daniel Kamerrer et al., Olympia, WA, Amicus Curiae on behalf of Washington State Association of Municipal Attorneys.
C. JOHNSON, J.
¶ 1 This case asks us to determine whether development rights vest upon filing of a site plan review permit application (site plan application).[1] Under Washington statutory law, development rights vest upon the filing of a complete building permit application, RCW 19.27.095(1).[2] This case involves the question of whether any common law or constitutional due process principles support a different rule. Abbey Road Group, LLC, filed a site plan application for a multifamily condominium development with the city of Bonney Lake (City). The application was denied based on a later adopted zoning change which prohibited this type of development. Abbey Road challenged the denial, first administratively, then in court. The hearing examiner found that Abbey Road's rights did not vest. The superior court reversed the hearing examiner's decision. The City appealed, and the Court of Appeals reversed and held that filing a building permit application is necessary to vest development rights. We affirm the Court of Appeals.

FACTUAL AND PROCEDURAL HISTORY
¶ 2 Abbey Road proposed a 575-unit condominium project on 36.51 acres within the City. Bonney Lake Municipal Code (BLMC) governs development procedures;[3] however, the City has not adopted a vesting ordinance. On June 15, 2005, Abbey Road representatives attended a preapplication meeting with the City. At the meeting, the City distributed a letter generally reviewing the information required for a site development plan application and indicating the land use application fees. Before the hearing examiner there was evidence that City officials had advised Abbey Road orally and in writing that site development review would not vest rights in the existing commercial zoning. Thereafter, Abbey Road embarked on the development process, expending more than $96,500 in the process.[4] On September 13, 2005, it submitted a site plan application, which is part of a preliminary stage in the development process relative to the building permit application phase. Later that same day, the City passed an ordinance rezoning the subject property to Residential/Conservation District, a zoning category precluding Abbey Road's multifamily development.
¶ 3 In an October 12, 2005, letter, the City Planning Director notified Abbey Road that its project had not vested under the prior ordinance because Abbey Road had not filed a building permit application and that its site plan application had been denied. Abbey Road appealed the director's determination to the hearing examiner. The hearing examiner found the director correctly determined that pursuant to Erickson & Associates, Inc. v. McLerran, 123 Wash.2d 864, 872 P.2d 1090 (1994), an applicant must submit a completed application for a building permit to vest the project. Abbey Road filed a petition under the Land Use Petition Act (LUPA), ch. 36.70C RCW challenging the hearing examiner's *182 determination. The superior court reversed the hearing examiner's decision. That court concluded Abbey Road's development rights vested on September 13, 2005, when it filed a complete site plan application.
¶ 4 The Court of Appeals reversed the superior court and affirmed the hearing examiner's determination that Abbey Road's development rights did not vest absent a building permit application, as required under RCW 19.27.095(1). Further, the Court of Appeals declined to expand the vested rights doctrine under common law principles to recognize vesting upon the filing of a site plan application. The court also concluded that the City's process was not unduly burdensome such that it unconstitutionally frustrates vesting rights, and that its vesting process complied with common law and statutory vesting rights.[5] Abbey Road petitioned this court, and we accepted review.[6]

ISSUE
¶ 5 Whether in these circumstances the filing of a site plan application vested Abbey Road's development rights?

ANALYSIS

A. Standard of Review
¶ 6 Judicial review of land use decisions proceeds under LUPA. The court may grant relief under LUPA only if the party seeking relief has carried the burden of establishing that one of the following standards is met:
(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.
RCW 36.70C.130(1). On appeal, Abbey Road challenged the hearing examiner's decision under (b), (c), (d), and (f), asserting it was an erroneous interpretation of the law, a clearly erroneous application of the law to the facts, and not supported by substantial evidence, and it violated Abbey Road's constitutional rights.
¶ 7 Standards (a), (b), (e), and (f) present questions of law, which we review de novo. Standard (c) concerns a factual determination that we review for substantial evidence. Substantial evidence is evidence that would persuade a fair-minded person of the truth of the statement asserted. Our deferential review requires us to consider all of the evidence and reasonable inferences in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority. Moreover, we give due deference to the local authority's construction of the law within its expertise. RCW 36.70C.130(1)(b). Standard (d) requires us to employ the clearly erroneous standard of review. Cingular Wireless, LLC v. Thurston County, 131 Wash.App. 756, 768, 129 P.3d 300 (2006).

B. Background: Vested Rights Doctrine
¶ 8 Our vesting doctrine grew out of case law recognizing that vesting rights is rooted in notions of fundamental fairness. This doctrine reflects the recognition that development rights can represent a valuable and protectable property interest. Erickson, 123 Wash.2d at 870, 872 P.2d 1090.
¶ 9 Washington's vested rights doctrine, as it was originally judicially recognized, entitles developers to have a land development proposal processed under the *183 regulations in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations. Hull v. Hunt, 53 Wash.2d 125, 130, 331 P.2d 856 (1958).
¶ 10 Washington's rule is the minority rule, and it offers more protection of development rights than the rule generally applied in other jurisdictions. The majority rule provides that development is not immune from subsequently adopted regulations until a building permit has been obtained and substantial development has occurred in reliance on the permit. Our cases rejected this reliance-based rule, instead embracing a vesting principle which places greater emphasis on certainty and predictability in land use regulations. By promoting a date certain vesting point, our doctrine ensures that "new land-use ordinances do not unduly oppress development rights, thereby denying a property owner's right to due process under the law." Valley View Industrial Park v. City of Redmond, 107 Wash.2d 621, 637, 733 P.2d 182 (1987). Our vested rights cases thus recognize a "date certain" standard that satisfies due process requirements.
¶ 11 In 1987, the legislature codified these judicially recognized principles in RCW 19.27.095(1). Laws of 1987, ch. 104, § 1. RCW 19.27.095(1) reads:
A valid and fully complete building permit application for a structure, that is permitted under the zoning or other land use control ordinances in effect on the date of the application shall be considered under the building permit ordinance in effect at the time of application, and the zoning or other land use control ordinances in effect on the date of application. The goal of the statute is to strike a balance between the public's interest in controlling development and the developers' interest in being able to plan their conduct with reasonable certainty. Development interests can often come at a cost to public interest. The practical effect of recognizing a vested right is to potentially sanction a new nonconforming use. "A proposed development which does not conform to newly adopted laws is, by definition, inimical to the public interest embodied in those laws." Erickson, 123 Wash.2d at 873-74, 872 P.2d 1090. If a vested right is too easily granted, the public interest could be subverted. Erickson, 123 Wash.2d at 874, 872 P.2d 1090.

C. Application of Doctrine
¶ 12 We have previously resolved many of the arguments in this case in Erickson, which involved a challenge to the constitutionality of a Seattle ordinance setting the vesting date either when a building permit application is filed or a master use permit (MUP) is issued.[7] The reasoning and the holding in Erickson largely control our decision here. In Erickson, the developer argued both that the ordinance was unconstitutional and that the vesting doctrine should be expanded. In rejecting this argument, we affirmed the statutory line by upholding the constitutionality of the ordinance and reasoning that under the ordinance, a developer could control vesting of a MUP application and, in all instances, vesting occurs no later than the statutorily prescribed building permit application stage or earlier under the ordinance when a MUP application is approved. We explicitly rejected Erickson's invitation to expand the vesting doctrine to the filing of a MUP application based on the developer's arguments that the burden or cost of submitting the application was sufficient to support a vesting of development rights at the time of the filing of the application. We confirmed that in the absence of a local vesting ordinance specifying an earlier vesting date, which in Erickson was the date of the issuance of the MUP, then RCW 19.27.095(1) is the applicable vesting rule.
¶ 13 Without addressing the statute, Abbey Road argues we should reconsider and overrule our decision in Erickson, maintaining we wrongly decided that case by failing to properly consider the cost to a developer of submitting an MUP application. *184 Abbey Road bases its argument for the extension of the vesting doctrine primarily on the contention that the cost to a developer of submitting a site plan application represents a level of commitment that entitles it to a vested right and is sufficient to deter permit speculation. Notably, Abbey Road raises the same cost-based arguments for the extension of the doctrine to MUP applications that we found unpersuasive in Erickson. See 123 Wash.2d at 874-75, 872 P.2d 1090. In summary, in Erickson, we declined to extend the vesting doctrine to MUP applications on the basis of cost for three reasons: (1) the cost of obtaining MUP applications varies greatly depending on the proposed project; (2) we refused to reintroduce a form of case-by-case analysis of costs and reliance interests, which we had rejected 40 years before in favor of a date certain vesting standard; and (3) unlike building permit applications, MUP applications may be submitted at the infancy of a project before the developer has made a substantial commitment to it. Erickson, 123 Wash.2d at 874-75, 872 P.2d 1090. Similarly, the costs involved in preparing and submitting a building permit application are often substantial. For the same reasons we rejected the invitation to extend the vesting doctrine in Erickson, we refuse to expand it in this case.[8]
¶ 14 In analyzing the vesting rules, the Court of Appeals in this case focused on Erickson and, in part, on the statute codifying the common law vesting doctrine. In upholding the hearing examiner's interpretation and application of the law, that court stated, "RCW 19.27.095(1) is unequivocal and requires a `valid and fully complete building permit application' be submitted for development rights to vest `on the date of the application.'" Abbey Road, 141 Wash.App. at 194, 167 P.3d 1213. As the Court of Appeals recognized, it is undisputed that Abbey Road did not file a building permit application. Further, Abbey Road points to no authority, either in its briefing to lower courts or to this court, allowing us to simply ignore the legislative directive set out in RCW 19.27.095(1).
¶ 15 Instead of discussing the relevance of this statutory directive to its case, Abbey Road's briefing presents the argument that Victoria Tower P'ship v. City of Seattle, 49 Wash.App. 755, 745 P.2d 1328 (1987) conflicts with Erickson and should control the outcome of this case. Abbey Road argues that Victoria Tower expanded the vested rights doctrine to include the filing of a site plan application. It reasons that Victoria Tower stands for the proposition that the filing of an MUP application vests development rights and that the same should hold true for a site development plan. But as the Court of Appeals properly noted, "[E]ither the Victoria Tower courts assumed that the two types of permits were equivalent or the distinction between a[n] MUP and a building permit was not before those courts." Abbey Road, 141 Wash.App. at 195, 167 P.3d 1213 (citing Erickson, 69 Wash.App. at 568, 849 P.2d 688). As such, the Court of Appeals correctly recognized that Abbey Road wrongly reads Victoria Tower. Victoria Tower did not change the long established requirement that, in order to preserve development rights, a building permit application must be filed. Even if Victoria Tower can be read to expand the common law vesting doctrine to MUP applications, it has been superseded by RCW 19.27.095(1) and our analysis in Erickson.

D. Expansion of Doctrine To Protect Individual Due Process Rights
¶ 16 Abbey Road also argues we should expand the vesting doctrine to site plan applications *185 in this case to protect its due process rights because the City's vesting process necessarily delays and frustrates vesting for large projects such that it is "unduly oppressive" under West Main Associates v. City of Bellevue, 106 Wash.2d 47, 52, 720 P.2d 782 (1986). Abbey Road contends the hearing examiner erroneously concluded that West Main was inapposite and that Bonney Lake's process did not frustrate vesting. According to Abbey Road, the hearing examiner incorrectly found it had the ability to fix the vesting date by submitting a building permit application at any time during the site plan review process and that the City processes site plan development permit applications and building permit applications concurrently. Resp't's Br. at 27-28.
¶ 17 In West Main, a developer challenged the validity of a Bellevue vesting ordinance which prohibited the filing of a building permit application until after a series of procedures was complete, including procedures such as administrative design review approval, site plan review approval, administrative conditional use approval, and modification of landscape approval. The ordinance also provided that development rights would vest only as of the time a building application was filed. This court held the Bellevue ordinance unconstitutional because the City denied the developer the ability to vest rights by filing for a building permit application until after a series of preliminary permits was obtained. The court concluded this amount of discretion subverted the vesting doctrine's underlying purpose, which is to protect a citizen's right to develop property free of the "fluctuating policy" of legislative bodies. 106 Wash.2d at 52-53, 720 P.2d 782. The problem with this argument is that Abbey Road has not identified any similar ordinances in the BLMC.
¶ 18 Nonetheless, Abbey Road argues that the City's application process is unconstitutional under West Main, and it relies primarily on its interpretation of the City's building permit application form. Abbey Road argues that the City's procedures, as evidenced by its building permit application form, "[r]equir[e] approved site development plans for a complete commercial building permit application...." Resp't's Br. at 37. Abbey Road asserts it should be able to rely on the accuracy of the application form, and conditioning submission of the building permit application on prior approval of the site permit application is prohibited under West Main. Resp't's Br. at 37, 40.
¶ 19 In response, the City contends that Abbey Road misinterprets the form, that nothing in the BLMC prevents a developer from submitting a building permit application before a site development application is approved, and that separate submission and approval for each type application is a voluntary process. According to the City, a developer can submit the site plan application and wait for the City to approve it before submitting a building permit application, or a developer can submit both applications to the City for concurrent review. If a developer chooses to do the latter, the concurrent submission will vest development rights, so long as a complete building permit application has been filed.
¶ 20 The City's building permit application form contains a checklist delineating items that may be included as part of the building permit application. Above the checklist, the form states, "Commercial Building Permit[:][m]ust be submitted with the following." Beside each item on the list that follows, there are two boxes; one, when checked, establishes that the item has been "submitted," and the other denotes the item is not applicable (N/A). One of the items on that list is "Six Copies of the Approved Site Development Plans." AR Ex. 28.
¶ 21 After hearing the testimony of Abbey Road representatives, including Gil Hulsmann and city officials, the hearing examiner found "not all documents listed on page 2 need be submitted for a completed application," because "the form contains a block for `N/A' which means `not applicable'". Clerk's Papers (CP) at 35. He further found that the City's past practices in at least two projects provide evidence confirming the City does not require prior approval of a site plan permit application before it allows a developer to apply for a building permit application. Specifically, the hearing examiner found:

*186 Mr. Hulsmann also served as agent for Abbey Road Group, LLC, in the Windermere Real Estate office project and submitted a building construction permit application packet on March 12, 2004, prior to receiving Type 3 permit approval.... Thus, contrary to his testimony, in one of Mr. Hulsmann's own projects, he submitted a building permit application well in advance of receiving Type 3 approval.
CP at 35-36. In addition, the hearing examiner found:
[I]n the Kitsap Bank project the applicant submitted a "Commercial or `Multi-Family Site Plan Review Application Form" on January 19, 2004.... The applicant also submitted a Commercial Building Permit Application on January 20, 2004, one day after submitting the Type 3 permit application.... The City issued the Type 3 approval on August 28, 2004, ... and apparently was prepared to issue the building permit on August 19, 2004.
CP at 36. Based on the testimony and the exhibits, the hearing examiner concluded:
[T]he Type 3 process does not prohibit an applicant from filing a building permit application prior to completion of the process. To the contrary, the intent of the [BLMC] is to streamline and combine reviews for various permits and guide development in the City. The [BLMC] encourages concurrent review of building permit applications and Type 3 applications.
CP at 37-38.
¶ 22 Abbey Road responds by arguing that the "N/A" boxes appear next to each item on the checklist making it more likely that the submission of each item on the list may not be required in every instance. For example, a site development plan may not be required to obtain a building permit for the remodel of an existing building. Abbey Road argues this is a hurdle similar to that found unconstitutional in West Main. But in West Main an ordinance prevented developers from filing a building permit application before other requirements were met.
¶ 23 Here, we have no ordinance or regulation precluding Abbey Road from simultaneously filing a site plan and a building permit application. Instead, the City claims to allow an integrated permitting process. It was Abbey Road that chose not to use this process, but to obtain site development plan approval before undertaking the additional step of filing a building permit application. While this may make good business sense, as building plans may change significantly depending on the final site plan approval, by the same token it suggests a builder that is not ready to proceed, and thus is not entitled to vesting under the very rationale of that doctrine. See Roger D. Wynne, Washington's Vested Rights Doctrine: How We Have Muddled a Simple Concept and How We Can Reclaim It, 24 Seattle U.L.Rev. 851, 928-29 (2001) (noting the developer may want to hedge its bets by seeking one permit at a time but does so at its own risk). But unlike the facts in West Main, the City here provided a process that allowed a builder the ability to control the date of vesting. Abbey Road's failure to seek a building permit prevents it from establishing that Bonney Lake would have refused the simultaneous filing or that it would have deemed the building permit application incomplete without a previously approved site plan.
¶ 24 The dissent insists that Abbey Road could not have filed a complete building permit application to allow it to vest, and thus the integrated process contemplated by Bonney Lake was no more acceptable than the Bellevue ordinance we declared unconstitutional in West Main. But the dissent misunderstands the vesting scheme under RCW 19.27.095. The statute leaves to the local authority the determination of when a building permit application is "fully complete[]." RCW 19.27.095(2). While there are certain minimum requirements for projects over $5,000, there is no contention these are at issue in this case, and even as to these requirements, the statute provides that an application submitted before this information is available will be deemed fully complete for vesting purposes so long as the applicant provides the required information as soon as it can reasonably be obtained. RCW 19.27.095(5). Here, as the hearing examiner determined, Bonney Lake accepted building permit applications during the pendency of site development plan review, and Abbey *187 Road could have submitted a "complete" building permit application without awaiting approval of the site development plan.
¶ 25 Nothing in the statute or the record in this case supports the dissent's contention that a building permit application cannot be deemed "complete" until an applicant who is denied a permit would be entitled to demand its issuance by bringing a writ of mandamus. This conclusion rests on a premise we have rejected, specifically a false dichotomy between ministerial and discretionary acts in the context of vesting rights under a building permit. See Norco Constr., Inc. v. King County, 97 Wash.2d 680, 684, 649 P.2d 103 (1982) ("The distinction between ministerial and discretionary acts is not relevant to the validity of procedural limits placed on the decisionmaking entity. The need for a `date certain' upon which a right vests is to avoid tactical maneuvering between parties and that need would appear equally strong whether the act is discretionary or ministerial.") While some early vesting cases arose in the context of a mandamus action, it is broadly recognized that most land use decisions today involve at least some measure of discretion and are not subject to a writ of mandamus. See Richard L. Settle, Washington Land Use and Environmental Law and Practice § 8.4(a) (1983). Moreover, the mandamus cases provide no support for the dissent's conclusion that a developer's rights vest upon application for a site plan review permit because the "date certain" established in the mandamus cases is the date the developer applies for a building permit. See State ex rel. Ogden v. City of Bellevue, 45 Wash.2d 492, 495-96, 275 P.2d 899 (1954) ("The right accrues at the time an application for a building permit is made."; Hull, 53 Wash.2d at 130, 331 P.2d 856 ("[T]he right vests when the party ... applies for his building permit, if that permit is thereafter issued."). Nor is there any suggestion that a local authority lacks the discretion to deny site plan approval (and all subsequent permits necessary for development) once a complete site plan review permit application is filed, so that the mandamus rationale would support vesting at this early stage.
¶ 26 In the final analysis, nothing in the City's municipal code or in its application procedures conditions the submission of a complete building permit application on prior approval of a site permit plan application. Abbey Road's own erroneous interpretation of the building permit application form is not a basis for finding the City's vesting procedures unconstitutional under the West Main standard. Abbey Road elected to proceed by obtaining site plan approval before applying for a building permit and cannot argue that its interpretation of the process it chose makes that process unconstitutional.
¶ 27 Although Abbey Road also argues that its case is analogous to West Main in part because it would have to file 24 building permit applications, its analogy fails. The number of requisite separate building permit applications is a function of the size of the project and does not make the process unduly oppressive. Here, the fact that Abbey Road has chosen to construct a 575-unit condominium project with 24 buildings is not a basis for altering the vesting doctrine. Abbey Road argues that the size or complexity of a project should determine the vesting date. If we accept its proposed rule, then the larger the development project is the more generous the vesting would be. We reject such a rule. Whether a planned development will have a single building or multiple buildings, in the absence of a local vesting ordinance, RCW 19.27.095(1) establishes the "date certain" standard for vesting regardless of the project size. It is the filing date of a building permit application. We conclude that, under Erickson, Abbey Road's arguments do not support a change in the vesting doctrine.
¶ 28 Finally, Abbey Road argues that as a matter of fundamental fairness this court should expand the vesting rights doctrine to all land use applications. They maintain that we should do so to harmonize a haphazard common law vesting doctrine, provide certainty to developers, protect developers' expectations against fluctuating land use policies, and update a doctrine that has failed to keep pace with increasingly complex changes in land development processes. To establish this fairness and certainty in the development *188 process, Abbey Road urges this court to establish a uniform vesting point "for every land use permit application regardless of the permit's name or what it does or does not do." Pet'rs' Reply to Resp. to Suppl. Br. at 3-5. We find that such a rule would eviscerate the balance struck in the vesting statute. While some of Abbey Road's arguments could support a change in the law, instituting such broad reforms in land use law is a job better suited to the legislature. See Wynne, supra, at 916-17 ("[r]eform [of the vesting rights doctrine] should not be left to the judiciary, which must focus on one narrow fact pattern at a time"; advocating legislative reform).
¶ 29 We affirm the Court of Appeals.
WE CONCUR: Justices SUSAN OWENS, and DEBRA L. STEPHENS.
MADSEN, J. (concurring).
¶ 30 I agree with the lead opinion that development rights do not vest with the filing of a site plan application. Rather, Washington law provides that the filing of a complete building permit application vests development rights. RCW 19.27.095(1). However, I write separately to acknowledge Abbey Road Group's legitimate concern about the City of Bonney Lake's building permit application process, though I conclude that here Abbey Road's failure to submit a building permit application is fatal to providing relief.

Discussion
¶ 31 In West Main Associates v. City of Bellevue, 106 Wash.2d 47, 52-53, 720 P.2d 782 (1986), this court held that a city may not reserve for itself sole discretion to determine the date of vesting by conditioning completion of a building permit application on prior city approval of the developer's site plan. Specifically, the Bellevue ordinance in West Main prohibited the filing of a building permit application for any proposed project until all of the following procedures were complete: "(1) administrative design review approval; (2) site plan review approval; (3) administrative conditional use approval; (4) modification of landscaping approval; (5) design review approval by the planning commission; (6) passage by the city council of any necessary ordinance approving a conditional use, shoreline conditional use, planned unit development or planned residential unit development; (7) approval by the board of adjustment of a variance or shoreline variance; and (8) issuance of a shorelines substantial development permit." Id. at 49, 720 P.2d 782. The ordinance also expressly provided no building permit application would be accepted until any appeals with respect to the first four requirements were completed, should appeal be sought. Finally, the ordinance provided that only the filing of a building permit application would vest development rights; filing of applications for any of the preliminary approvals would not.
¶ 32 Abbey Road argues that, as in West Main, Bonney Lake's application process conditions the submission of a building permit application on prior city approval of site plans and is, therefore, invalid under West Main. Indeed, the city's building permit application includes a checklist of materials to be submitted with the application, including one line which calls for six copies of the approved site development plans. Although the hearing examiner noted that the applicant can check the "not applicable" box by the line for approved site development plans, Abbey Road points out that every item on the checklist has a "not applicable" box next to it. It convincingly reasons that an applicant cannot check that box for all items and reasonably assume that the application would be complete for vesting purposes. Abbey Road asserts that a better explanation for the "not applicable" boxes is that in some circumstances a particular item may not apply to the particular project. For example, an approved site development plan would not be applicable to a building permit for a remodel of an existing building.
¶ 33 Abbey Road correctly points out that Bonney Lake's process, according to its checklist, can be read to require approval of a site development as a prerequisite to filing a building permit application. However, unlike the City of Bellevue in West Main, no ordinance or regulation prohibits a developer from filing a building permit application at the same time that a site development plan is *189 filed. Nor does Bonney Lake's checklist preclude approval of a site development plan at the same time as a building permit application is submitted. Because Abbey Road did not even attempt to file a building permit application, it cannot show that Bonney Lake would have refused such an application or whether the city would deem its application to be incomplete without an approved site development plan. Thus Abbey Road has failed to prove that Bonney Lake's process violates due process. Id. at 52-53, 720 P.2d 782.
¶ 34 I agree with the remainder of the lead opinion's reasoning and its result.
WE CONCUR: Justice MARY E. FAIRHURST.
SANDERS, J. (dissenting).
The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen with regret and with indignation, that sudden changes and legislative interferences in cases affecting personal rights, become jobs in the hands of enterprizing and influential speculators; and snares to the more industrious and less informed part of the community.[[1]]
¶ 35 The lead opinion and concurrence claim Abbey Road Group's site development plan application does not vest to the legal requirements in place at the time of its filing under state statute or local ordinance. I agree. But that is the point: property owners are deprived their property absent that process due under our state and federal constitutions when government "den[ies] developers the ability to determine the ordinances that will control their land use." W. Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 53, 720 P.2d 782 (1986); see also Erickson & Assocs., Inc. v. McLerran, 123 Wash.2d 864, 871, 872 P.2d 1090 (1994) ("A developer controls the date of vesting by selecting the time at which he/she chooses to submit a completed building application.").
¶ 36 With these principles in mind, the lead and concurring opinions cry out for an answer to a simple question: If Abbey Road had filed a building permit application without an approved site plan, would its right to build under existing ordinances vest at that time?
¶ 37 If the answer is yes, the majority is arguably consistent with Erickson; however, if the answer is no, we have a situation controlled by West Main. But the lead opinion and concurrence do not answer the question because they can't without demonstrating the incoherence of their analysis.
¶ 38 Abbey Road owns approximately 36 acres of property in the city of Bonney Lake (City). In June 2005 it began planning for the development of the Skyridge Condominiums, a 575 unit project consisting of 24 separate buildings. After meeting with city officials, Abbey Road embarked on the first step it was required to complete before it could move forward: obtain approval for a Type 3 site development permit. This Type 3 permit application is no trifling matter. An applicant must submit a SEPA checklist; a traffic impact analysis; a storm water report and detailed site plan, both of which must be prepared by a civil engineer; and a detailed landscaping plan prepared by a licensed landscaping architect, and pay a $3,674.00 application fee.
¶ 39 On September 13, 2005 Abbey Road submitted its application. It had taken three months and $228,000.00 for Abbey Road to reach this stage in its development project.[2] Later that very day, the City passed Ordinance No. 1160 rezoning Abbey Road's land from C-2, which allows multifamily development, to RC-5, which doesn't. The City then told Abbey Road its application would not be processed because it could no longer build a multifamily development on its own property.
¶ 40 Abbey Road administratively appealed to the City's hearing examiner, who conducted a hearing and thereafter prepared findings of fact and conclusions of law. Pertinent to this dissent is finding of fact 18:

*190 While the City will not issue a building permit until the Director has granted Type 3 land use approval, nothing prohibits an applicant from submitting a building permit concurrent with the Type 3 application or at any time during the process Thus, the past practices of the City confirms staff's testimony that applicants may file a building permit application at any time to include concurrently with the Type 3 permit application and vest their project. In the present case, the appellant did not file a building permit application and thus did not vest the project.
Clerk's Papers (CP) at 36. The portion of this finding regarding vesting is a legal conclusion, as is conclusion 3:
The appellant could have filed a building permit application prior to October 3, 2005, and vested the project....
CP at 38. Abbey Road assigned error to these and other factual findings and conclusions in its "LAND USE PETITION (RCW 36.70C) AND COMPLAINT FOR DAMAGES," timely filed in the Pierce County Superior Court. CP at 4.[3] We review conclusions of law mislabeled findings of fact de novo as conclusions of law. Willener v. Sweeting, 107 Wash.2d 388, 394, 730 P.2d 45 (1986).
¶ 41 The lead opinion holds forth Erickson as controlling and dismisses West Main as inapplicable. But the lead opinion's reliance on Erickson is misplaced, and its dismissal of West Main is based on the unwarranted and unstated assumption that Abbey Road could have filed a fully complete building permit and vested its rights without an approved Type 3 permit. Because as a matter of law Abbey Road could not have filed a complete building permit application to vest its rights without a Type 3 site plan approval, I dissent.
¶ 42 Washington's vested rights doctrine is founded in mandamus principles. In the very first case to expound the doctrine, we stated:
A property owner has a vested right to use his property under the terms of the zoning ordinance applicable thereto. A building or use permit must issue as a matter of right upon compliance with the ordinance. The discretion permissible in zoning matters is that which is exercised in adopting the zone classifications with the terms, standards, and requirements pertinent thereto, all of which must be by general ordinance applicable to all persons alike. The acts of administering a zoning ordinance do not go back to the questions of policy and discretion which were settled at the time of the adoption of the ordinance....
... An owner of property has a vested right to put it to a permissible use as provided for by prevailing zoning ordinances. The right accrues at the time an application for a building permit is made.
State ex rel. Ogden v. City of Bellevue, 45 Wash.2d 492, 495-96, 275 P.2d 899 (1954) (citations omitted). Four years later, we confirmed the doctrine in Hull v. Hunt:
Notwithstanding the weight of authority, we prefer to have a date certain upon which the right vests to construct in accordance with the building permit.... [T]he right vests when the party, property owner or not, applies for his building permit, if that permit is thereafter issued. This rule, of course, assumes that the permit applied for and granted be consistent with the zoning ordinances and building codes in force at the time of application for the permit.
53 Wash.2d 125, 130, 331 P.2d 856 (1958). A building permit is ministerial, not discretionary. When a developer submits an application for a building permit, his rights vest at the time of the application as long as the permit must be issued as a matter of right. The permit may be obtained by writ of mandamus.[4]State ex rel. Craven v. City of *191 Tacoma, 63 Wash.2d 23, 26, 385 P.2d 372 (1963); Ogden, 45 Wash.2d at 496, 275 P.2d 899. Our subsequent case law has established that a building permit issues by right if it is (1) complete and (2) complies with the relevant ordinances in place at the time of the application. See, e.g., Allenbach v. City of Tukwila, 101 Wash.2d 193, 200, 676 P.2d 473 (1984).[5] Our legislature has statutorily mandated a building permit application must be "fully complete" to vest. RCW 19.27.095(1). "The requirements for a fully completed application shall be defined by local ordinance...." RCW 19.27.095(2).[6] Thus, when a building permit application meets these requirements, the development rights are vested at the time of the filing of the application. See Hull, 53 Wash.2d at 130, 331 P.2d 856. But if an application is not fully complete, or does not comply with the relevant ordinances, it cannot be issued as a matter of right, and therefore development rights do not vest at the time of application. See id.
¶ 43 In West Main we recognized this doctrine in the context of a due process claim. We held that if a "[c]ity denies a developer the ability to vest rights until after a series of permits is obtained," the ordinance is unduly oppressive upon individuals and violates due process. W. Main, 106 Wash.2d at 52-53, 720 P.2d 782. This is entirely consistent with vesting rationale. A city cannot make completion of a building permit application contingent upon approval of preliminary permits because the city, not the developer, would then have the discretion to determine the vesting date.
The purpose of the vesting doctrine is to allow developers to determine, or "fix," the rules that will govern their land development. See Comment, Washington's Zoning Vested Rights Doctrine, 57 Wash. L.Rev. 139, 147-50 (1981). The doctrine is supported by notions of fundamental fairness. As James Madison stressed, citizens should be protected from the "fluctuating policy" of the legislature. The Federalist No. 44, at 301 (J. Madison) (J. Cooke. ed.1961). Persons should be able to plan their conduct with reasonable certainty of the legal consequences. [Charles B.] Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L.Rev. 692 (1960). Society suffers if property owners cannot plan developments with reasonable certainty, and cannot carry out the developments they begin.
Of course, all institutions, including government, like to keep options open. But while keeping options open normally involves a price, government can keep its options open at no cost to itself in the vesting game because virtually all the risk of loss is initially imposed on the developer. Unfortunately, that loss is still a social cost, ultimately borne by all, whether or not government recognizes it.
(Footnote omitted.) [Donald G.] Hagman, The Vesting Issue: The Rights of Fetal Development vis a vis The Abortions of Public Whimsy, 7 Envtl. L. 519, 533-34 (1977).
W. Main, 106 Wash.2d at 51, 720 P.2d 782. Bellevue's vesting ordinance violated due process because it took away the developer's right to vest at a time of his choosing by *192 conditioning vesting on discretionary preapplication procedures. Although Bonney Lake does not have a vesting ordinance as such, in substance it does the same as Bellevue by making it impossible to vest a building permit application until discretionary site plan approval is obtained from the city.
¶ 44 The lead opinion claims Erickson is controlling. Lead op. at 183. In Erickson the constitutionality of a city ordinance was challenged. Erickson, 123 Wash.2d at 869, 872 P.2d 1090. The ordinance mandated a Master Use Permit (MUP) would not vest development rights until (1) a fully complete building permit was filed or (2) the MUP was approved. Id. We held that due process was satisfied in Erickson because "[a]t any point in the MUP review process a developer can file a complete building permit application. The developer's rights then vest ....," id. at 870, 872 P.2d 1090 (emphasis added) and "[u]nder Seattle's ordinance, Erickson could have protected its rights by filing a building permit at the beginning or at any point in the process," id. at 871, 872 P.2d 1090 (emphasis added). Our decision in Erickson was thus premised precisely on the ability of the developer under the Seattle ordinance to file a fully complete building permit application "[a]t any point in the MUP review process" and so unilaterally control the date of vesting. Id. at 870, 872 P.2d 1090. The lead opinion asserts that, like Erickson, Abbey Road could have filed a building permit application at any point. However filing an incomplete application vests nothing. Therefore Erickson is controlling only if Abbey Road could have controlled the date of vesting without Type 3 permit approval.
¶ 45 Here, like West Main, Bonney Lake created an administrative hurdle to Abbey Road's ability to vest. Our vesting law requires a "fully complete building permit application," as defined by local ordinance. RCW 19.27.095(1). The Bonney Lake Municipal Code (BLMC) gives authority to the director of planning and community development, the director of public works, and the building official to administer and enforce BLMC Title 14, "including decisions on Type 1-3 permits as set forth in Chapter[] ... 14.50 BLMC."[7] BLMC 14.10.070(A). According to BLMC 14.50.010, "The applicant shall complete the appropriate application form and submit application, environmental checklist, and applicable fees to the director(s). The application form shall specify the submittal requirements." BLMC 14.50.010 (emphasis added). Thus the director has authority to summarize code requirements in an application form, but he doesn't have authority to change those code requirements, no matter how he crafts his form. Here the form reflected the ordinance requirement that a fully complete building permit application include an approved Type 3 site development plan. AR Exs. 27, 28. This was in strict accordance with the requirement of local ordinance. BLMC 14.50.060(C) ("No building permit shall be issued for work requiring a Type 3 permit until the 15-day appeal period has lapsed."); BLMC 14.90.020(D) ("If one permit cannot be reasonably processed until another is issued, such as a building permit ..., the 120 days within which a notice of decision must be issued for contingent permit ... shall not begin until the other permit has been issued.").[8]
¶ 46 No one contends Abbey Road could have received building permit approval absent Type 3 permit approval, although the lead opinion and the concurrence try to finesse the point. An incomplete building permit does not vest as a matter of right. Hull, 53 Wash.2d at 130, 331 P.2d 856; Ogden, 45 Wash.2d at 495-96, 275 P.2d 899. The city thus passed an ordinance which removed the unrestricted ability of the property owner to vest, the result which West Main found violates due process.
*193 ¶ 47 The lead opinion admits that the building permit application form states that an approved site plan must be submitted with the building permit application, lead op. at 185, but points to the "N/A" box next to the site plan requirement on the building permit form, as if to say (but not really saying) if the site plan isn't approved yet, just check the box, submit the application, and vest your rights Lead op. at 186. But here the lead opinion and concurrence slip gears. They apparently assume a fully complete building permit application could have been filed without an approved Type 3 site plan if the developer checks the N/A box. Id. Every requirement on the building permit application has an N/A box next to it. Pet. for Review at 17 n. 11. Can applicants simply check all the N/A boxes, submit the "complete" building permit application, and vest their rights?[9] If the lead opinion or concurrence is holding that, let them plainly say so. Double talk does not provide the date certain vesting required by due process. "[A]dherence to the constitution requires more than clever word play." In re Dependency of K.R., 128 Wash.2d 129, 148, 904 P.2d 1132 (1995) (Johnson, J., dissenting).
¶ 48 Moreover the hearing examiner expressly found "the information requested for a building permit must be submitted in order for a complete application." CP at 33. The examiner based this finding on a letter from the city that stated unequivocally, "[A]ll information requested on the application forms (Building Permit and Planning Department) shall be submitted in order for a complete application." Id. Thus it is the City's understanding by operation of law that an application would not have been fully complete unless the approved site plan was included. Moreover, the examiner also found "[w]hile the City will not issue a building permit until the Director has granted Type 3 land use approval, nothing prohibits an applicant from submitting a building permit concurrent with the Type 3 application or at any time during the process." CP at 36. This may be true; however, rights vest upon submitting a building permit application only if it is fully complete and the building permit must thereafter issue as a matter of right. Hull, 53 Wash.2d at 130, 331 P.2d 856. Put a different way, a building permit vests rights only if it is fully complete satisfying all ordinance requirements for issuance. See RCW 19.27.095; Hull, 53 Wash.2d at 130, 331 P.2d 856; Ogden, 45 Wash.2d at 495, 275 P.2d 899; Allenbach, 101 Wash.2d at 200, 676 P.2d 473. The Bonney Lake land use code requires Type 3 approval before a building permit can legally issue; therefore a building application would not have been fully complete without the Type 3 permit approval. And the building permit could not issue because it didn't comply with this ordinance requirement. The concurrent submission of a Type 3 site plan application and a building permit application could not have vested Abbey Road's rights as a matter of law because Abbey Road could not file a fully complete building permit application to vest its rights without first getting the City's approval of the Type 3 permit application. And if Abbey Road did not have the ability to choose its date certain for vesting independent of the City's approval of a preliminary permit, it was deprived of its constitutional right to be "protected from the `fluctuating policy' of the legislature." W. Main, 106 Wash.2d at 51, 720 P.2d 782 (quoting The Federalist No. 44, at 301 (James Madison) (J. Cooke ed.1961)).
*194 ¶ 49 In summary, unlike Erickson, but very much like West Main, Abbey Road could not unilaterally control the date this project vested as required by the due process clauses of our state and federal constitutions. Even if Abbey Road could have submitted a building permit application at the outset, before the zoning ordinance was amended, it could not have submitted an approved site plan as part of that application because that required the subsequent discretionary approval of the City of Bonney Lake. Therefore, according to all the preexisting precedent of this court as well as the statutes of this State, a building permit application submitted without a site plan approval could not be "fully complete." Unlike Erickson, Abbey Road could not have unilaterally vested anything under this ordinance scheme.
¶ 50 The problem with the lead and concurring opinions is not only that they come to the wrong conclusion, but they muddle and finesse an area of the law where certainty is critical. The State and localities have a great deal of discretion to determine by ordinance what the rules shall be. But the property owner has a constitutional right to proceed under current ordinances by submitting a complete building permit application to vest its rights at any time of its choosing. When the government prevents him from doing this, it deprives the developer of his property without due process of law. I would remand to the superior court for appropriate relief consistent with this opinion.
¶ 51 I dissent.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, Justices JAMES M. JOHNSON, and TOM CHAMBERS.
NOTES
[1] The full title on the application form is "Commercial or Multi-Family Site Plan Review Application Form Type 3 Permit." AR Ex. 27.
[2] The legislature also codified vesting for plat applications. See RCW 58.17.033.
[3] Title 14 BLMC. Chapter 14.50 governs Type 3 permits.
[4] This amount is from the hearing examiner's findings. The record reflects other amounts. Abbey Road did not dispute this particular finding or the hearing examiner's finding that Abbey Road's expenditures amounted to only approximately.007% of the anticipated project cost. Clerk's Papers (CP) at 12.
[5] Abbey Road Group, LLC v. City of Bonney Lake, 141 Wash.App. 184, 167 P.3d 1213 (2007).
[6] Abbey Road Group, LLC v. City of Bonney Lake, 163 Wash.2d 1045, 187 P.3d 750 (2008).
[7] The parties generally proceed as if MUP applications and site plan review applications are substantially the same, though Abbey Road indicates there may be some difference between the processes in terms of when a developer incurs the cost associated with each application. Report of Proceedings (RP) at 13.
[8] Abbey Road also argues that we should expand the vested rights doctrine based on case law, contending that there is no "rational reason" for refusing to expand the doctrine to site plan applications when the courts have done so in other contexts. Pet'rs' Reply to Resp. to Suppl. Br. at 3. See Juanita Bay Valley Cmty. Ass'n v. City of Kirkland, 9 Wash.App. 59, 510 P.2d 1140 (1973) (grading permit applications); Talbot v. Gray, 11 Wash.App. 807, 525 P.2d 801 (1974) (shoreline permit applications); Ford v. Bellingham-Whatcom County Dist. Bd. of Health, 16 Wash.App. 709, 558 P.2d 821 (1977) (septic tank permit application); Beach v. Bd. of Adjustment, 73 Wash.2d 343, 438 P.2d 617 (1968) (conditional use permit applications); Weyerhaeuser v. Pierce County, 95 Wash.App. 883, 976 P.2d 1279 (1999) (conditional use permit applications). Again, in Erickson, we considered and rejected similar arguments, and we are not persuaded to overrule our analysis or holding in Erickson.
[1] The Federalist No. 44 (James Madison).
[2] Abbey Road estimates that it spent $128,000, not $96,500 as the majority claims. Pet. for Review at 3 n. 3. Another $100,000 was spent on securing the option on the property. Id.
[3] The parties stipulated that Abbey Road's claim for money damages would be bifurcated from the Land Use Petition Act, ch. 36.70C RCW, side of the case to be decided thereafter. CP at 43-45.
[4] The lead opinion's discussion of mandamus is somewhat perplexing. It claims that "most land use decisions today involve at least some measure of discretion and are not subject to a writ of mandamus." Lead op. at 187. True enough, and no one claims that a site plan approval may be issued by writ of mandamus. Id. But the lead opinion makes no claim and cites no authority that a complete building permit application in conformity with applicable ordinances is not subject to issuance by mandamus. Does the lead opinion or concurrence claim filing an application for a discretionary permit vests rights? In an area where certainty is essential, the lead opinion is simply incoherent.
[5] More recent cases have added a third requirement, that the application is "filed during the effective period of the zoning ordinances under which the developer seeks to develop." See, e.g., Erickson, 123 Wash.2d at 868, 872 P.2d 1090. The source of this element is unclear, but it is entirely superfluous. Of course the ordinances at the time of filing, and thus vesting, are the controlling ordinances. That is the whole point of the vesting doctrine.
[6] Here it is important to note how the lead opinion and concurrence obscure this statutory requirement by stating, "The statute leaves to the local authority the determination of when a building permit is `fully complete.' RCW 19.27.095(2)." Lead op. at 186. To the contrary under this statute whether or not a building permit application is "fully complete" is not a discretionary determination by a land use official but rather a question of law to be determined by operation of local ordinance.
[7] Title 14 Development Code of the Bonney Lake Municipal Code is attached as "III.3. City Ordinances" to the Administrative Record herein.
[8] The lead opinion claims the problem with Abbey Road's reliance on West Main's holding that local discretion interfering with the developer's unfettered right to vest this project when he sees fit violates due process "is that Abbey Road has not identified any similar ordinances in the BLMC." Lead op. at 185. These ordinances which require site plan approval as a condition precedent to the issuance of a building permit do exactly that.
[9] The lead opinion points to a number of instances where the city processed Type 3 permit applications and building permit applications simultaneously. Lead op. at 185-86. These examples are meaningless, since none of them involved any dispute over vesting. AR Report of Proceedings at 99. The fact that the city may have processed the applications simultaneously has no bearing on whether the original building permit application would have been complete for vesting purposes. Notably, no building permits were ever issued without prior approval of a site plan. The lead opinion claims that these instances merit "due deference to the local authority's construction of the law within its expertise." Lead op. at 182. However no deference is due agency legal arguments construing its own ordinance. Rather deference is limited only to agency practices which historically enforce its ordinances. Sleasman v. City of Lacey, 159 Wash.2d 639, 646-47, 151 P.3d 990 (2007); Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 815, 828 P.2d 549 (1992). Here the pattern of prior agency enforcement demonstrates that building permits will not issue absent an approved site development plan, illustrating exactly the reason why a building permit application cannot vest absent this mandatory component.