

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| TOTAL OUTDOOR CORPORATION, a Washington corporation, | ) ) ) | No. 70957-7-I |
| Appellant, | ) ) | |
| v. | ) ) | |
| CITY OF SEATTLE DEPARTMENT OF PLANNING AND DEVELOPMENT, a municipal corporation, | ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondent. | ) ) | FILED: March 16, 2015 |

VERELLEN, A.C.J. — Seattle ordinances recognize genuine distinctions between nonconforming uses and the nonconforming structures associated with such uses. The core issue presented in this Land Use Petition Act[1] (LUPA) appeal is whether the owner of legal nonconforming structures who, without required permits, demolishes those structures and then erects new structures in violation of a stop-work order may rebuild or "repair" to dimensions larger than allowed in the most recent permit issued by the City.

Sufficient evidence supports the Seattle Department of Planning and Development (Department) determination that dimensions of the demolished structures were not known with certainty because the owner demolished and erected new structures without seeking the required permits. The Department's resulting conclusion

---
[1] Ch. 36.70C RCW.

that a rooftop sign frame and sign face,[2] may not be rebuilt or repaired to dimensions larger than those approved in the most recent permit is not clearly erroneous. We are not persuaded that the common law doctrine of abandonment has any application in this setting.

Accordingly, we affirm the Department's determination that the height and width of the rooftop sign frame (including the sign base) and the square footage of the sign face are limited to the dimensions documented in the 1981 building permit and sketch. But we reverse the Department's determination that the sign's lighting is limited to 816 watts.

FACTS

In 1926, the city of Seattle (City) issued a permit to build an illuminated rooftop sign atop the Centennial Building in downtown Seattle. There have been several major developments since 1941.

---

[2] For purposes of this opinion, "sign frame" refers to the steel lattice framework for mounting and supporting structural sign components. Unless otherwise indicated, the sign frame does not include the 4.5 foot tall metal base that connects the sign frame to the rooftop. "Sign face" refers to the structural sign components that are mounted on or attached to the sign frame. We also distinguish between the structural components constituting the sign face and the words or images of advertising copy that are displayed from time to time on the sign face.

This terminology is consistent with the ordinances defining "structure" as "anything constructed or erected on the ground or any improvement built up or composed of parts joined together in some definite manner and affixed to the ground, including fences, walls and signs," and "sign" as "any medium, including structural and component parts used . . . for advertising," Seattle Municipal Code 23.84A.036 (SMC); "sign structure" as "[a]ny structure which supports or is designed to support any sign," and "display surface" as "[t]he area of a sign structure used to display the advertising message," former Seattle Building Code (SBC) 3107.3 (2009); and "advertising copy" as synonymous with "[a] message on [a] sign[.]" Former SBC 3107.4.2(2).

Until 1975, a large 55 foot by 68.5 foot sign[3] advertised railroads.

In 1974, the City adopted an ordinance prohibiting all rooftop signs in the downtown zone from exceeding 30 feet above the roofline or nearest parapet.

In 1975, the sign face was changed to a 26 foot by 60 foot display surface,[4] used to advertise Alaska Airlines. The 1975 permit reflects the sign frame was lowered to 30 feet "to make it conforming to exist[ing] sign code."[5]

Effective October 24, 1975, the City prohibited any rooftop signs in the downtown zone.

In 1978, a 4 foot by 48 foot electronic message center was also attached to the sign frame. The 1978 permit refers to the "message center sign on existing structure."[6]

In 1981, the Department issued a permit authorizing the installation of new sign components in place of the 26 foot by 60 foot Alaska Airlines sign face. The 1981

---

[3] The 1941 permit does not indicate whether the 55 foot by 68.5 foot dimensions refer to the size of the sign frame or the sign face, or whether the sign's height was measured above the roof parapet, the 4.5 foot tall metal base, or the roofline. See Clerk's Papers (CP) at 731 ("Records of the sign face size and shape are less clear, but [the Department] acknowledges that there is a 1941 permit . . . that gives dimensions of 55 feet by 68.5 feet. Height and width are not specified, and there is no specific information about the frame size or sign face size, but presumably the sign face height was 55 feet and width was 68.5 feet, based on photographs of the sign before and after 1941.").

[4] Like the 1941 permit, the May 1975 permit does not indicate whether the 26 feet by 60 feet refers to dimensions of the sign frame or the sign face. But the City acknowledged in its October 26, 2012 proposed decision that "these dimensions presumably refer to the sign face size." CP at 731.

[5] CP at 85. It is unclear from the permit and associated documents whether the sign frame was lowered to 30 feet as measured from the roof parapet, the top of the 4 to 5 foot tall metal base, or the roofline.

[6] CP at 94. The parties dispute whether the 1975 changes had been completed prior to October 24, 1975. But the outcome of this appeal would be the same regardless of whether the 55 foot by 68.5 foot sign face and larger sign frame remained in place as of October 24, 1975.

permit is the most recent permit for the rooftop sign. That permit allowed a 5 foot by 54.5 foot Cameras West name and logo to be mounted at the top of the sign frame, together with a 3.5 foot by 48 foot electronic message center[7] mounted several feet below the name and logo. Both were mounted "on [the] existing [sign frame] structure."[8] A sketch attached to the 1981 permit depicts the top of the sign frame and the top of the Cameras West name and logo portion of the sign face both at 30 feet above the "roofline."[9]

In November 2011, Total Outdoor, the current agent of the owner,[10] removed the Cameras West components and installed a new solid rectangular display surface containing a holiday greeting.[11] In December 2011, Total Outdoor requested a sign registration number for the legal nonconforming rooftop advertising sign.[12] While waiting for the Department to respond to the request, Total Outdoor removed and replaced the sign frame on the existing 4.5 foot tall metal base without obtaining a permit. A department inspector observed workers removing the existing sign frame and sign face and constructing a new sign frame. On January 31, 2012, the Department

---

[7] Although the 1978 permit authorized the erection of a 4 foot by 48 foot message center sign, the 1981 permit depicts the dimensions of the existing message center sign as 3.5 feet by 48 feet. Compare CP at 94, with CP at 101.

[8] CP at 311.

[9] CP at 100-01. The sign face's total area as measured by the 1981 permit was 440.5 square feet, which included both the 54.5 foot by 5 foot Cameras West name and logo and the 3.5 foot by 48 foot electronic message center.

[10] Our references to "owner" include the owner's agents.

[11] Although no dimensions are available, a photo reveals that the new display surface covered most of the width and more than half the height of the sign frame. CP at 34, 282.

[12] See SMC 23.55.014(F).

issued a stop-work order because the existing "sign [frame] structure . . . ha[d] been completely demolished and a new sign [frame] structure erected" without a permit.[13] Without obtaining a permit, Total Outdoor then violated the stop-work order by installing a new solid, rectangular display surface 20 feet high by 60 feet wide on the new sign frame displaying an ad for a computer tablet. An inspector ultimately measured the top of the sign frame, including the 4.5 foot base, as 34 feet above the roofline. The new sign frame was 56.5 feet wide, and the top of the new 20 foot by 60 foot display surface was even with the top of the sign frame at 34 feet above the roofline, including the 4.5 foot base. In February 2012, the Department denied Total Outdoor's request to withdraw the stop-work order, noting that Total Outdoor violated the building code by failing to obtain required permits and by ignoring the posted stop-work order.

In response to Total Outdoor's request for a sign registration number, the Department confirmed that the owner had a valid nonconforming use to engage in off-premises rooftop advertising.

In response to correction notices issued by the Department, Total Outdoor asserted that it had merely made a piece-for-piece replacement of rusted steel members making up the sign frame lattice and that the new frame was exactly the same size as before demolition. The Department acknowledged that it "may or may not be true" that the current sign frame and sign face are the same size as immediately before Total Outdoor's recent work, but because the sign frame and sign face were "removed and reconstructed without first obtaining the necessary DPD permits, the actual

---

[13] CP at 386; see also former SBC 3107.4.1 ("A permit issued by the building official is required before any sign is erected, re-erected, constructed, painted, posted, applied, altered, structurally revised, or repaired, except as provided in this chapter.").

dimensions of the rooftop sign structure are not known with certainty."[14] The Department concluded "it is most reasonable to expect that the dimensions matched the most recent permit issued [in 1981]."[15]

Although "a nonconforming structure may be maintained, and a continuous nonconforming use may be recognized," the Department determined that the code does not "provide a means to simply tear down and replace a roof[top] sign with a new and larger structure."[16] To determine whether the sign frame's height and width had been expanded, the Department principally relied on the 1981 sketch. Because the work performed under the 1981 permit was approved in a final inspection, the Department reasoned that the work must have complied with the dimensions set out in the 1981 sketch. Therefore, the rooftop sign "is limited to the sign frame size, overall height, and sign face size" as depicted by the sketch attached to the 1981 permit—a sign frame 30 feet high above the roofline including the 4.5 foot tall sign base, by 54.5 feet wide, and a sign face of 440.5 square feet.[17] The Department also concluded that the rooftop sign is limited to 816 watts for illumination.

Total Outdoor appealed the Department's final decisions to the superior court. The superior court denied Total Outdoor's LUPA petitions, and affirmed the Department's decisions.

Total Outdoor appeals.

---

[14] CP at 864.

[15] CP at 864.

[16] CP at 734.

[17] CP at 863.

## ANALYSIS

### *Standard of Review*

Under LUPA, we review the "final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination" directly on the administrative record.[18] To prevail, Total Outdoor must establish that the Department made a mistake of law, that there was insufficient evidence to support the decision, or that the decision was clearly erroneous.[19]

The "mistake of law" standard applies if the "land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise."[20] This standard presents a question of law, which we review de novo.[21]

Under the "substantial evidence" standard, relief is warranted if the "land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court."[22] We consider "all of the evidence and reasonable inferences in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority."[23] This process "'entails acceptance of the factfinder's views regarding . . . the weight to be given reasonable but competing

---

[18] RCW 36.70C.020(2); Lakeside Indus. v. Thurston County, 119 Wn. App. 886, 894, 83 P.3d 433 (2004).

[19] RCW 36.70C.130(1); Rosema v. City of Seattle, 166 Wn. App. 293, 297-98, 269 P.3d 393 (2012).

[20] RCW 36.70C.130(1)(b).

[21] Abbey Rd. Grp., LLC v. City of Bonney Lake, 167 Wn.2d 242, 250, 218 P.3d 180 (2009).

[22] RCW 36.70C.130(1)(c).

[23] Abbey Rd., 167 Wn.2d at 250.

inferences.'"[24] We must determine whether the record contains "'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'"[25]

The "clearly erroneous" standard supports relief if the "land use decision is a clearly erroneous application of the law to the facts."[26] "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed."[27]

*Sufficiency of the Evidence*

First, we focus on the factual disputes. There is no dispute that the Department agreed that the owner has a legal nonconforming use for off-premises rooftop advertising. Total Outdoor argues that insufficient evidence supports the Department's finding that its most recent work increased the size of the sign. Total Outdoor contends that it made a piece-for-piece repair of the sign frame and that the 1981 sketch is not reliable in light of the 2012 construction photos revealing that the new sign frame is exactly the same size as the sign frame it replaced, both sitting atop the 4.5 foot base. But the Department expressly noted the actual dimensions of the sign frame that was dismantled are not known with certainty because Total Outdoor dismantled the existing sign frame without obtaining a permit. Additionally, the sufficiency of the evidence

---

[24] City of University Place v. McGuire, 144 Wn.2d 640, 652, 30 P.3d 453 (2001) (quoting State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce, 65 Wn. App. 614, 618, 829 P.2d 217 (1992)).

[25] City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (quoting Callecod v. Wash. State Patrol, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)).

[26] RCW 36.70C.130(1)(d).

[27] Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000).

standard is extremely deferential to the fact finder. The Department may rely on the evidence and all reasonable inferences viewed in a light most favorable to the Department and may determine the weight to be given to reasonable but competing inferences.[28] Because the work completed under the 1981 permit received a final inspection and approval, the Department is allowed the reasonable inference that the work would not have been approved unless it complied with the dimensions depicted in the 1981 permit and sketch—a total height of 30 feet above the roofline including the 4.5 foot tall sign base. Photos taken during the recent construction may suggest that a completed section of the new frame on one edge of the sign frame matches up with the height of a section of the old frame on the other edge of the sign frame. But no precise "before" measurements are available and the photos do not include a precise frame of reference. Even accepting that the photos may support a competing inference that the new sign frame is the same size as the sign frame it replaced, the Department was entitled to give greater weight to the competing reasonable inference arising from the final inspection and approval of the work completed under the 1981 permit.

As to the sign face attached to the sign frame, it is undisputed that the current sign components exceed the 440.5 square foot sign face approved in the 1981 permit. Total Outdoor argues that the 1981 configuration is not the proper base to measure against and that changes in advertising copy from time to time cannot alter the permissible dimensions of the sign. But Total Outdoor itself cites the building code reference to "advertising copy" or "copy" as synonymous with a "message on . . . [a]

---

[28] McGuire, 144 Wn.2d at 652.

sign[.]"[29] Changes reducing the size of the sign components physically mounted on or attached to the sign frame are not mere changes in the words and images constituting the message on a sign. For example, if the owner of a 20 foot by 60 foot billboard changes the words and images on that display surface, that is a mere change in advertising copy. But if the owner removes the billboard and replaces it with a new structure that is half the size, 10 feet by 30 feet, that constitutes a change in the sign's structural component, whether or not the new smaller surface is used to display a message that is identical to or different from the message that had been displayed on the larger surface. Here, the owner's changes to the sign face were not mere changes to the message on the sign; changes to the structural components attached to the sign frame altered the nonconforming structures.

*Changes to Nonconforming Structures*

Although it is undisputed that Total Outdoor may engage in the legal nonconforming use of rooftop advertising, this appeal turns on the owner's changes to the nonconforming rooftop sign frame and sign face structures made without required permits and in violation of a stop-work order.

A zoning change can render a structure nonconforming, for example, as to setbacks, lot size, and other dimension standards.[30] An owner's right to maintain, alter, rebuild, or repair a nonconforming structure is subject to the restrictions imposed by

---

[29] Appellant's Opening Br. at 3 (alterations in original) (citing former SBC 3107.4.2(2)).

[30] 8A EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 25:182, at 21 (3d ed. rev. 2012); 2 PATRICIA E. SALKIN, AMERICAN LAW OF ZONING § 12.11 (5th ed. 2014).

zoning laws.[31] For example, most courts have upheld ordinances imposing reasonable phase-out deadlines (amortization periods) for eliminating nonconforming structures.[32] Specifically, an owner's right to rebuild a nonconforming structure is governed by ordinance.[33]

With minor exceptions, the SMC does not use the term "nonconforming structures" but defines the equivalent phrase "nonconforming to development standards" as a "structure . . . that met applicable development standards at the time it was built or established, but that does not now conform to one or more of the applicable development standards."[34] The SMC includes specific provisions that govern such

---

[31] See 8A McQUILLIN, supra, § 25:216 at 192 ("The general rule is that structural or substantial alterations of nonconforming structures are prohibited under zoning laws."); Eunice A. Eichelberger, Annotation, *Alteration, Extension, Reconstruction, or Repair of Nonconforming Structure or Structure Devoted to Nonconforming Use as Violation of Zoning Ordinance*, 63 A.L.R.4TH 275, § 2(a) (1988) ("A determination as to whether an alteration, extension, reconstruction, or repair of a nonconforming structure . . . is permissible is dependent on, or is affected by, the particular provisions of the applicable zoning ordinance.").

[32] 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 4.21, at 252 (2d ed. 2004) ("Most decisions uphold the phase-out technique, which has become a standard feature of zoning."); see also Ackerley Commc'ns, Inc. v. City of Seattle, 92 Wn.2d 905, 913-19, 602 P.2d 1177 (1979) (upholding an ordinance requiring removal of outdoor advertising signs without compensation after three- to seven-year amortization period); Village of Skokie v. Walton on Dempster, Inc., 119 Ill. App. 3d 299, 456 N.E.2d 293, 296-97, 74 Ill. Dec. 791 (1983) (approving a sign ordinance requiring removal after two- to seven-year grace period depending on original cost).

[33] See State ex rel. Edmond Meany Hotel, Inc. v. City of Seattle, 66 Wn.2d 329, 337, 402 P.2d 486 (1965) (applying an ordinance precluding reconstruction of a building nonconforming as to height, even if use as hotel or adult living facility is conforming).

[34] SMC 23.84A.026. The code does refer to "nonconforming structures" in SMC 23.42.112(A)(5), which allows renovations, repairs, or structural alterations that increase nonconformity "as specifically permitted for nonconforming uses and *nonconforming structures* elsewhere in this Land Use Code."

nonconforming structures.

Two provisions permit an owner to rebuild a nonconforming structure. The first is limited to structures "occupied by or accessory to a residential use" and has no application here.[35] The other provides that "[a]ny structure nonconforming to development standards that is destroyed by fire, act of nature, or other causes beyond the control of the owner, may be rebuilt to the same or smaller configuration existing immediately prior to the time the structure was destroyed."[36] Because there has not been any destruction by fire, act of nature, or other cause beyond the owner's control, and the owner demolished the structures without a permit, the owner here had no right to rebuild the sign frame or sign face to pre-1981 dimensions.

A separate provision allows repair of a nonconforming structure but not any expansion or increase in nonconformity. "A structure nonconforming to development standards may be maintained, renovated, repaired or structurally altered but may not be expanded or extended in any manner that increases the extent of nonconformity or creates additional nonconformity [with exceptions that do not apply here]."[37] Further, the plain meaning of "repair" is "to restore by replacing a part or putting together what is torn or broken."[38] A repair does not extend to rebuilding to the original or pre-1981 dimensions.

---

[35] SMC 23.42.112(B).

[36] SMC 23.42.112(C).

[37] SMC 23.42.112(A); see also SMC 23.42.106(D)(1) ("A structure occupied by a nonconforming nonresidential use may be maintained, repaired, renovated or structurally altered but shall not be expanded or extended except as otherwise required by law.").

[38] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1923 (2002).

Here, the owner reduced the size of the rooftop sign frame and sign face over the years. In 1975, the owner reduced the dimensions of the sign face to a 26 foot by 60 foot display surface and reduced the height of the sign frame.[39] Based on the 1978 permit, a 4 foot by 48 foot message center was added to the then-existing sign frame structure. Most importantly, the 1981 permit resulted in an illuminated Cameras West name and logo measuring 5 feet tall by 54.5 feet wide installed "on existing structure."[40] The sketch attached to the 1981 permit depicts the top of the sign frame and top of the sign face as 30 feet above the "roofline." The permit and attached sketch also included an electronic message center of 3.5 feet by 48 feet located a short distance below the name and logo.

A repair of the corroded steel lattice frame could include a piece-for-piece replacement of corroded steel components but does not encompass rebuilding to dimensions larger than those permitted and approved by the Department in 1981. The sign face's size is also limited to the 1981 dimensions. Total Outdoor may not rebuild the sign frame or the sign face to the pre-1981 dimensions.

Total Outdoor contends that the common law abandonment doctrine extends to nonconforming structures used in conjunction with such nonconforming uses. We disagree.

First, it is undisputed that Total Outdoor demolished the existing structures and erected new sign structures without obtaining required permits and continued its work in

---

[39] It is unclear from the record whether the sign's 1975 reduction in height to 30 feet was measured from the roof parapet, the 4.5 foot high metal based attached to the sign frame structure, or the roofline.

[40] CP at 238.

violation of a posted stop-work order. Total Outdoor cites no authority that these building code violations are excused by any common law doctrine.

Second, Washington's common law abandonment doctrine applies to nonconforming uses. Specifically, the right to engage in a legal nonconforming use "may be lost by abandonment or discontinuance, but a party so claiming has a heavy burden of proof."[41] Abandonment or discontinuance depends on two factors: "'(a) [a]n intention to abandon; and (b) an overt act, or failure to act, which carries the implication that the owner does not claim or retain any interest in the right to the nonconforming use.'"[42] Total Outdoor contends that the Department may not distinguish between nonconforming uses and the nonconforming structures affiliated with such uses.

But "[t]he distinction between a nonconforming use of land and a nonconforming building/structure is genuine and can be critical under ordinances or statutes that provide separate regulations for 'nonconforming structures.'"[43] Further, nonconforming structures and nonconforming uses are analytically separate.[44] The Seattle ordinances

---

[41] Rosema, 166 Wn. App. at 299.

[42] Id. (alteration in original) (internal quotation marks omitted) (quoting Van Sant v. City of Everett, 69 Wn. App. 641, 648, 849 P.2d 1276 (1993)).

[43] 2 SALKIN, supra, § 12:11.

[44] See 8A McQUILLIN, § 25:182, at 21 ("[C]ourts try to keep these issues analytically separate."); Vial v. Provo City, 2009 UT App 122, 210 P.3d 947, 951-52 ("The city ordinances provide for nonconforming uses, nonconforming structures, nonconforming lots, and other nonconformities. These are all different." (citations omitted)); Jones v. Planning Bd. of Marlborough, 203 A.D.2d 626, 628, 609 N.Y.S.2d 972 (1994) (holding that the city ordinances specifically distinguished between nonconforming uses and nonconforming structures); County of Lake v. Courtney, 451 N.W.2d 338, 341 (Minn. App. 1990) (holding that to equate a use exception with a structure exception "tortures" an ordinance's "plain and ordinary meaning").

on nonconformity include references to both "use" and "development,"[45] but the code separately defines and regulates nonconforming structures and nonconforming uses.[46]

Here, the nonconforming use is advertising.[47] The use is distinct from a structure that may be used to accomplish that use. The code includes separate provisions governing rebuilding or repairing a structure that does not conform to development standards.[48] The overlaps cited by Total Outdoor do not alter this fundamental and genuine distinction.[49]

---

[45] SMC 23.42.102.

[46] "'Use, nonconforming' means a *use* of land or a structure that was lawful when established and that does not now conform to the *use* regulations of the zone in which it is located, or that has otherwise been established as nonconforming according to section 23.42.102 [delineating various means to establish nonconforming status]." SMC 23.84A.040 (emphasis added); see also Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wn.2d 1, 6, 959 P.2d 1024 (1998) ("A nonconforming use is a use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the [current] zoning restrictions applicable to the district in which it is situated."). SMC 23.42.112 provides an entirely separate definition governing "structures" that do not conform to development standards, such as sign dimensions and rooftop signs.

[47] It is undisputed that the nonconforming use is subject to the doctrine of abandonment. For example, the Department applied the doctrine of abandonment to conclude that the owner is not restricted to on-premises advertising because the owner never intended to abandon its right to the nonconforming use of off-premises advertising.

[48] SMC 23.42.112.

[49] See also State ex rel. Miller v. Cain, 40 Wn.2d 216, 242 P.2d 505 (1952) where the court held that the owner of a gasoline service station was not entitled to a building permit to reconstruct the existing service station by replacing a structure and a canopy, which together covered 450 square feet, with a steel reinforced structure covering 631 square feet. The court pointed out that the case law is practically unanimous that a nonconforming building devoted to a nonconforming use cannot be replaced with a new and larger nonconforming building even though it would be devoted to the same use. The court declared that the property owner had no vested right in the perpetuation of the use of her property as a gasoline service station as would compel the issuance of a building permit for a new and larger nonconforming building to make that use effective.

Finally, Total Outdoor's other arguments related to abandonment are not persuasive:

- Total Outdoor focuses on the SMC 23.42.100 reference to a "framework for dealing with nonconformity that allows most nonconformities to continue." But SMC 23.42.100 also recognizes that "[t]he redevelopment of nonconformities to be more conforming to current code standards is a long term goal."

- Total Outdoor cites Rosema v. City of Seattle to argue common law abandonment principles apply here.[50] Rosema held that the nonconforming right to use a house as a duplex had not been abandoned because the house's basement unit "maintain[ed] the structural capability" to operate as a separate unit.[51] Unlike the nonconforming duplex in Rosema, the owner here demolished the rooftop sign frame and sign face.

- Total Outdoor cites three out-of-state cases to support its contention that abandonment principles can apply to nonconforming structures. But these cases are not persuasive because they do not directly address the question before us.[52]

---

[50] 166 Wn. App. 293, 269 P.3d 393 (2012).

[51] Id. at 300.

[52] 69th Str. Retail Mall LP v. Upper Darby Zoning Hr'g Bd., 2012 WL 8681672 (Pa. Commw. Mar. 27, 2012) (unpublished) (nonuse of a billboard sign for statutory period of discontinuance did not, by itself, establish an abandonment of that sign; the sole issue analyzed on appeal was the interplay between discontinuance and abandonment); Pallco Enters., Inc. v. Beam, 132 Cal. App. 4th 1482, 34 Cal. Rptr. 3d 490 (2005) (illegal addition of illumination to a nonconforming use of an advertising sign; rejecting the argument that the addition of illumination was a voluntary abandonment of the advertising displays and holding that nonuse of the sign was not an abandonment of the landowner's legal, nonconforming use, emphasizing the use of advertising); 3M Nat'l Adver. Co. v. City of Tampa Code Enforcement Bd., 587 So. 2d 640 (Fla. Dist. Ct. App.

- Total Outdoor argues the rights that vested when the structures and use became nonconforming determine the outcome of this dispute. But the use of advertising is not foreclosed here and the only rights at issue are those of an owner of a nonconforming structure. Those rights are limited to the code provisions governing the scope and extent of a nonconforming structure. We find no support in the land use or building codes for allowing an owner to rebuild or "repair" a nonconforming sign frame or sign face to prior dimensions more than 30 years after reducing the size of those structures.[53]

- Finally, Total Outdoor highlights the portion of the Department's decision that "the size of the structure and sign face that [existed] in 1975 was *abandoned* when the sign structure and face became smaller in 1981 and thus, more

---

1991) (holding that, in the context of landowner's attachment of a full-size model airplane to the top of a nonconforming sign, "a prohibited increase in a nonconforming *use* does not result in loss of the entire use, at least if the landowner can return to the status quo ante.") (emphasis added) (italics omitted).

[53] Total Outdoor cites to case law discussing an owner's "vested rights" in a nonconforming use, such as McMilian v. King County, 161 Wn. App. 581, 591, 255 P.3d 739 (2011) ("'Legal, nonconforming uses are vested legal rights'" (quoting First Pioneer Trading Co. v. Pierce County, 146 Wn. App. 606, 614, 191 P.3d 928 (2008))); Rhod-A-Zalea, 136 Wn.2d at 6 ("The right to continue a nonconforming use despite a zoning ordinance which prohibits such a use in the area is sometimes referred to as a 'protected' or 'vested' right."). We note the concept of vested rights in a nonconforming use is not precisely the same as an application of the Washington "vested rights doctrine." See McGuire, 144 Wn.2d at 652 ("Nonconforming uses *are treated like vested property rights,* and may not be voided easily." (emphasis added)). The vested rights doctrine applies only to a narrow set of circumstances prescribed by statute for building permit applications, RCW 19.27.095(1), and subdivision applications, RCW 58.17.033(1). "[T]he vested rights doctrine is now statutory." Town of Woodway v. Snohomish County, 180 Wn.2d 165, 173, 322 P.3d 1219 (2014); see also Potala Vill. Kirkland, LLC v. City of Kirkland, 183 Wn. App. 191,192, 334 P.3d 1143 (2014) ("Washington's vested rights doctrine originated at common law but is now statutory."). We have not been provided any compelling authority that an owner has any right as to the size of nonconforming structures beyond those provided in statute or ordinance.

17

conforming."[54] But when read in context, this passing reference does not reveal a concession by the Department that the common law abandonment doctrine applies here.

*Wattage Limitations*

Finally, Total Outdoor contends the City erred when it determined that the maximum wattage permitted for the sign was 816 watts. We agree.

In an apparent typographical error, the Department's decision refers to section 1132.1, "Lighting and Motors," of the 2009 Seattle Energy Code to support its determination that only 816 watts are permitted for the sign.[55] But section 1132.1 relates to "fenestration requirements" that involve the "areas . . . in the building envelope that let in light" and has nothing to do with "Lighting and Motors." It appears the City intended to refer to section 1132.3 of the 2009 Seattle Energy Code, which is entitled "Lighting and Motors." But that provision is also inapplicable because it requires compliance with current lighting standards only when 20 percent or more of the fixtures are replaced "in a space enclosed by walls or ceiling-height partitions." The rooftop sign is not in a space enclosed by walls or partitions. The Department provides no authority that the rooftop sign is subject to specific energy code wattage limitations.[56]

---

[54] CP at 869 (emphasis added).

[55] CP at 874, 1113.

[56] Because Total Outdoor replaced nonconforming exterior lighting, it appears the "light and glare" standards of the respective zone where the exterior lights are located do apply. See SMC 23.42.124; SMC 23.49.025.

## CONCLUSION

There are genuine distinctions between nonconforming uses and nonconforming structures in the Seattle ordinances. The actual dimensions of the demolished sign frame and sign face were not known with certainty because of Total Outdoor's failure to obtain a permit and its continuation of work in violation of the stop-work order. The Department's resulting decision to limit the sign frame and sign face to the dimensions documented in the 1981 permit and sketch was supported by sufficient evidence and was not clearly erroneous. But it was an error of law for the Department to conclude that specific wattage limits apply.

We reverse the Department's determination that Total Outdoor is limited to 816 watts in conjunction with the rooftop sign. We affirm the Department's other decisions.

Affirmed in part and reversed in part.

WE CONCUR: