# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

RMG WORLDWIDE LLC,
MICHAEL H. MOORE, its Manager,

Appellant,

v.

PIERCE COUNTY,

Respondent.

No. 75401-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: December 18, 2017

MANN, J. — RMG Worldwide LLC (RMG) appeals two land use decisions of the Pierce County hearing examiner. In the first decision, the examiner found that RMG could not subdivide its existing golf course for residential development under the General Use zoning that was in effect in 1990, and that RMG must instead submit applications consistent with the current development regulations. In the second decision, the examiner held that RMG could not revive and proceed under a 1990 application for a Planned Development District (PDD)/Rezone approval because the PDD/Rezone application was abandoned. RMG appealed both decisions to the superior court under the Land Use Petition Act (LUPA), chapter 36.70C RCW. The superior court affirmed both decisions of the hearing examiner. We also affirm.

No. 75401-7-I/2

<u>FACTS</u>

*The Property*

This case concerns a 157 acre parcel of property located in the southeast quadrant of the intersection of 208th Street East and 46th Avenue East in the Graham area of unincorporated Pierce County. In the mid-1980s, the property owners, Harold LeMay Enterprises, Inc. and Otaka, Inc. (collectively LeMay), began exploring the possibility of developing a golf course on the land and consulted with experts and the County. Following its consultations, LeMay decided to improve a portion of the property with a golf course, single family residential dwellings, and a small commercial area. The County advised LeMay that it could construct the golf course by obtaining a grading and filling permit. At the time, the property was zoned General Use, a Pierce County zoning classification which allowed multiple and varied uses. In February 1989, the County issued a grading and filling permit for construction of a golf course on the central portion of the property, approximately 125 acres of the 157 acre parcel. LeMay then began construction of the golf course.

*Development of the Property*

On May 18, 1990, LeMay filed an application for the "Classic Estates, a PDD."[1] The application requested a PDD, a rezone, and a preliminary subdivision. The detailed description of the request was for "Creation of 96 single family lots, an 18-hole championship public golf course and commercial reserve on a 157.6 acre parcel of

---

[1] Under the Pierce County Code (PCC) 18.10.610 (A), a Planned Development District or PDD is "intended to be a flexible zoning concept. . . . The uses within the PDD depend on the uses in the underlying zone or the Potential Zone. The residential densities within the PDD may vary depending upon how the land is developed with general aesthetics, natural areas, and open space being an incentive."

vacant land. Property will be served by public water, private roads and individual on-site septic systems." The application identified that 120.6 acres would be left in open-space with 30 acres left in natural vegetation.

Shortly after LeMay submitted the PDD application, the Pierce County Department of Planning and Natural Resource Management (Department) contacted LeMay's agent and advised him that, under the General Use zone, a golf course was listed as an "unclassified use" and would need an unclassified use permit (UP) before it could operate. The Department subsequently met with representatives from LeMay to discuss options for proceeding. The meeting was summarized in a June 26, 1990, letter from Robert Hansen, the Department's principal planner:

> I wish to summarize our meeting last Tuesday in regard to the Classic Golf Course and what was necessary in order for the course to open.
>
> I first presented you last year an[d] at this meeting with two options. The course's construction could open with the approval of either a Planned Development District (PDD) or with an Unclassified Use Permit (UP), both requiring a public hearing before a Hearing Examiner. A PDD was suggested if uses other than the golf course were to be proposed. However, a PDD was likely to take more time to complete since more factors will be examined in a multiple use project. Therefore, it was determined by your group to have an Unclassified Use Permit requesting only the golf course with land set aside for future development. It was understood that a Major Amendment to the Unclassified Use Permit could be requested in the future and would be necessary if further land development is to take place.
>
> It was my determination that the earliest the matter could be brought before the Hearing Examiner is Tuesday, August 2, 1990, if a site plan, application and filing fees were filed by Tuesday, June 25, 1990. . . . Decision upon the Unclassified User Permit for the golf course would occur within two to four weeks depending upon the schedule of the Hearing Examiner and we will emphasize to the Examiner that we would like a decision on this matter as soon as possible.[2]

---

² (Emphasis added.)

That same day, June 26, 1990, Lemay submitted an application for a UP permit for the golf course. The application requested "an Unclassified Use Permit be issued to allow construction of an 18-hole golf course with clubhouse, parking and related facilities . . . Portions of the site along the west boundary and at the northeast corner will be retained for future development."

Consistent with the Department's letter to LeMay, on August 2, 1990, a public hearing was held before the Pierce County hearing examiner to consider the UP application. On October 2, 1990, the hearing examiner issued a decision approving the UP for the golf course (UP9-90). The UP9-90 decision was not appealed. On June 20, 1991, LeMay recorded a memorandum of agreement and covenant setting forth the conditions and requirements for the operation and maintenance of the golf course approved by UP9-90.

On September 11, 1990, prior to the hearing examiner's decision, LeMay submitted a letter formally requesting to "reactivate" the Classic Estates preliminary plat/PDD. The Department responded on January 10, 1991, by notifying LeMay's project engineer that it would treat the request for the 96 lot residential subdivision as a major amendment to the UP:

> As we discussed in our January 10, 1991, telephone conversation, I will be processing the residential portion of this proposal as a Major Amendment to the already adopted and approved Classic Golf Course Unclassified Use Permit, UP9-90. In this way, the potential for the establishment of a water tower to provide potable and fire fighting flows for the residential subdivision and the golf course building can be addressed.

On February 14, 1991, the Department issued a staff report for the "Preliminary Plat: Classic Estates Unclassified Use Permit: UP9-90, Classic Golf Course (Major

Amendment)." The proposal was described by staff as a request for "a major amendment to a previously approved Unclassified Use Permit to establish a 96 lot single-family residential subdivision and a single 8 ft. high water tower." The staff report set out the pertinent policies and regulations that the hearing examiner was required to address, including the existing comprehensive plan, zoning code, and the required findings and determinations necessary for approval under the Pierce County Subdivision Code.

After a public hearing, on March 5, 1991, the hearing examiner issued a report and decision on March 5, 1991 (1991 decision). After reviewing the testimony and proposal, the examiner concluded that the "proposal does not adversely affect the neighbors or the neighborhood and the appropriate provisions by the regulatory requirements and the conditions hereof shall provide for public health, safety and general welfare for the surrounding neighborhood." The decision approved a major amendment to UP9-90 allowing for the establishment of "a 96 lot single-family residential subdivision and a single 8 foot high water tower adjacent to the Classic Golf Course." The decision required submission of a final subdivision plat within 3 years with a provision for a one year extension. The hearing examiner's decision approving the major amendment was not appealed.

After the hearing examiner granted one-year extensions of the deadline for submitting a final subdivision plat in 1994, 1995, and 1996, on May 18, 1998, the

hearing examiner approved the final plat of the 96 lot subdivision adjacent to the golf course.[3]

In 1993, LeMay subsequently applied for and received a large lot subdivision that divided the 157 acres parcel into three lots. Lot 1, in the northeast corner of the original parcel, contains 6.25 acres and is improved with 11 single family residential lots and an area set aside and zoned for commercial use. Lot 2 contains 124.83 acres and supports an 18-hole golf course, practice driving range, parking spaces, and a clubhouse. Lot 3 extends along the west property boundary, contains 26.51 acres, and is improved with 85 single family residential units.

Meanwhile, the legislature adopted the Growth Management Act (GMA), chapter 36.70A RCW in 1990. The County adopted its first GMA comprehensive plan in 1994. The comprehensive plan placed LeMay's property outside the County's urban growth area (UGA). The County then changed the zoning on the property from General Use to Rural Reserve. The Rural Reserve zoning classification is a rural (i.e., non-urban) zoning classification that limits residential lot sizes to one residential dwelling unit per five acres. The County's rezoning of the property from General to Rural Reserve was not challenged.

*Recent Attempt to Develop the Golf Course Parcel*

RMG purchased Lot 2, the 120 acres golf course parcel, in 2005 and continued to operate it as a golf course. Between 2005 and 2013, RMG unsuccessfully attempted to have Pierce County amend the comprehensive plan to place the golf course parcel

---

[3] In the May 1995 decision granting a one-year extension, the hearing examiner noted the effect of the County's new GMA comprehensive plan: "[t]he Comprehensive Plan places the site in Rural Reserve designation. . . .The applicant's plat is of a substantially greater density than allowed by the plan."

and the subdivision within the County's UGA, and change the zoning from Rural Reserve to Moderate Density Single Family—an urban zoning classification. Following the most recent attempt in 2013, the County advised RMG that it would be many years before the parcel would be placed within the UGA. The golf course parcel zoning remains outside of the UGA and zoned Rural Reserve.

On February 13, 2014, RMG's agent submitted a proposal to the Department seeking another major amendment to UP9-90 allowing RMG to develop the golf course property as a new residential subdivision. RMG's letter recognized that LeMay's original 1990 PDD/Rezone application for the entire 157 acre property had been converted to an application for a UP: "[t]he County (over LeMay's objection) processed the PDD/preliminary plat application as an unclassified use permit." The letter requested the Department to process a major amendment to UP9-90 "under the zoning in effect at the time when UP9-90 was approved."

On March 24, 2014, the Department responded by issuing an administrative determination concluding that in order to convert the golf course parcel into a residential subdivision, RMG would need to file a new application for a major amendment to the UP and a new application for a subdivision. The administrative determination informed RMG that the new subdivision would need to be consistent with the current zoning density prescribed by the current zoning code, Rural Reserve, rather than General Use zoning that was in effect in 1990.

On April 3, 2014, RMG appealed the Department's administrative determination to the Pierce County hearing examiner; again arguing that redevelopment of the golf course into a residential subdivision should be reviewed under the 1990 zoning. After a

public hearing, on August 5, 2014, the examiner denied RMG's appeal (2014 decision).

The examiner's findings and conclusions included:

- The Department's June 26, 1990, letter gave LeMay two options to complete and open the golf course: (a) proceed with the PDD/Rezone or (b) apply for an unclassified use permit in order to open the golf course, reserving the remainder of the property for future development.

- LeMay elected to proceed with the unclassified use permit and submitted an application on June 26, 1990.

- LeMay received approval for the unclassified use permit UP9-90 to develop the golf course on October 2, 1990.

- LeMay subsequently received approval for a major modification to UP9-90 allowing for preliminary plat approval for a 96 lot residential subdivision on adjacent to the golf course.

- LeMay constructed both the golf course and adjacent residential subdivision within UP9-90.

- LeMay then applied for and received a large lot subdivision separating the golf course parcel (parcel 2) from the residential parcels (parcels 1 and 3).

- RMG acquired the golf course parcel in 2005 and has operated it as a golf course since then.

- RMG unsuccessfully attempted to have the golf course property brought within the county's urban growth area and rezoned for to allow urban residential density.

- Approval of UP9-90 did not rezone the property nor did it establish a density for future residential development.

- To establish a single family subdivision RMG must apply for an amendment to UP9-90 and a preliminary plat that meets current zoning regulation.

After unsuccessfully seeking reconsideration, on September 22, 2014, RMG filed a timely petition for judicial review under LUPA. The parties agreed to stay the 2014 LUPA petition.

-8-

On October 15, 2014, RMG sought, in the alternative, to "pursue completion of the pending rezone and PDD applications submitted in May of 1990." On January 14, 2015, the Department responded with a second administrative determination finding that the 1990 PDD/Rezone application had been abandoned.

RMG also appealed the second administrative determination to the hearing examiner. After a hearing, on August 6, 2015, the examiner denied RMG's appeal, finding the original 1990 PDD/Rezone application had been abandoned (2015 decision). The examiner's findings and conclusions included:

- When LeMay applied for the unclassified use permit on June 26, 1990, it abandoned the previous application for the PDD/Rezone.

- All subsequent activities of Pierce County, LeMay, and LeMay's successors, including RMG, were consistent with the decision to apply for the unclassified use permit and abandon the PDD/Rezone.

- The Department's staff report for the 1990 hearing on the unclassified use permit noted the change in the permit application from a PDD/Rezone to an unclassified use permit.

- LeMay's agent, Moore, confirmed in his 1990 hearing testimony that the application had changed to an unclassified use permit.

- In March 1991, the hearing examiner approved a major amendment to the UP9-90 approving a 96 lot residential subdivision for a portion of the property.

- In 1998, the hearing examiner approved the final plat for the 96 lot residential subdivision portion of the property.

- Pierce County zoning maps were never amended to show a zone change or PDD approval.

- After purchase, RMG attempted to have the golf course property moved into the urban growth area and rezoned for urban development.

- Seeking approval of a PDD/Rezone application after 25 years is inconsistent with timely processing and approval of land use application, the doctrine of finality, and the 21-day appeal period under LUPA.

RMG timely filed a second LUPA petition. The parties agreed to consolidate the two LUPA petitions in the King County Superior Court. After a consolidated hearing on the merits, on May 19, 2016, the superior court denied RMG's petitions for review. RMG appeals.

## ANALYSIS

### Standard of Review

LUPA provides the exclusive means for judicial review of a land use decision. Phoenix Dev., Inc. v. City of Woodinville, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011). In reviewing a land use decision, this court stands in the same position as the superior court and reviews the administrative record before the hearing examiner. Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wn.2d 740, 751, 49 P.3d 867 (2002).

For an appellant to overturn a land use decision under LUPA, the appellant carries the burden of proving one or more of six standards of relief set out in RCW 36.70C.130(1). Abbey Rd. Grp., LLC v. City of Bonney Lake, 167 Wn.2d 242, 249, 218 P.3d 180 (2009). RMG pursues relief under LUPA standards (a), (b), (c), (d), and (f), which state:

a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

> d) The land use decision is a clearly erroneous application of the law to the facts; . . .
>
> f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1).

Standards (a), (b), and (f) present questions of law that we review de novo. We give due deference to the local government's construction of the law within its expertise. Abbey Rd., 167 Wn.2d at 250. Standard (c) concerns a factual determination that we review for substantial evidence. "Substantial evidence is evidence that would persuade a fair-minded person of the truth of the statement asserted." Abbey Rd., 167 Wn.2d at 250. We view the facts and inferences in a light most favorable to the party that prevailed in the highest fact-finding forum. In this case, the County prevailed before the hearing examiner. Abbey Rd., 167 Wn.2d at 250. A finding is clearly erroneous under subsection (d) when, although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000).

*1990 Unclassified Use Permit*

At the outset, it is necessary to distinguish between LeMay's February 1990 application for a PDD and rezone—the Classic Estates PDD, and its June 26, 1990, application for a UP to construct an 18 hole golf course, clubhouse, and related facilities—UP9-90.

A PDD, often referred to in other jurisdictions as a planned unit development (PUD), or a planned residential development (PRD), is a regulatory technique which

excuses a developer from otherwise applicable zoning regulations in exchange for submitting to detailed, tailored regulations. City of Gig Harbor v. N. Pac. Design, Inc., 149 Wn. App. 159, 169, n.9, 201 P.3d 1096 (2009). Under the 1990 Pierce County Code, a PDD is "intended to be a flexible zoning concept." The uses within the PDD depend on the uses in the underlying zone or the "potential zone" if a rezone is also requested. "The residential densities within the PDD, however, may vary depending upon how the land is developed with general aesthetics, natural areas, and open space being an incentive." If the applicant seeks to include a use that is not allowed in the existing code, they may simultaneously apply for a rezone. An approval of a PDD or PDD/Rezone is considered an amendment to the zoning map. PCC 18.10.610 (J).

A UP in contrast does not rezone or amend the zoning map. A UP is designed to address uses that may or may not be appropriate in a particular zone due to their variability in size, number of people involved, traffic, and immediate impact. A UP simply approves a particular land use on a particular parcel or parcels. As Division Two of this court explained in 1990,

> The Pierce County Code authorizes the examiner to consider applications for unclassified use permits in general use zones, and to grant them for proposed uses that are consistent with the purpose and intent of the Comprehensive Plan, land use management programs, and the spirit and intent of the Code, and for uses that are not "unreasonably incompatible" with the uses permitted in the surrounding areas.

Maranatha Min., Inc. v. Pierce County, 59 Wn. App. 795, 801, 801 P.2d 985 (1990). In 1990, the Pierce County Code identified golf courses as a type of use that requires a UP.

Here, it is undisputed that LeMay applied first for the Classic Estate PDD, which proposed the "creation of 96 single family lots, an 18-hole championship public golf course and commercial reserve area on a 157.6 acre parcel of vacant land." The application included a concurrent request for a rezone. Then, after the County suggested that LeMay could speed up the opening of its golf course by opting instead to submit an application for a UP, LeMay promptly complied. On the same day the County notified LeMay of its two options, LeMay submitted an application for UP9-90 "to allow construction of an 18-hole golf course with clubhouse, parking & related facilities" while retaining "portions of the site along the west boundary & at the northeast corner" for future development.

Consistent with LeMay's choice to proceed under the UP process, the hearing examiner reviewed and approved UP9-90. Importantly, the hearing examiner's report and decision approving UP9-90 makes no mention of LeMay's earlier application for a PDD or for residential housing. Instead, finding that construction of a public golf course was compatible with the surrounding residential uses and beneficial to the public, UP9-90 approved only the "continued construction of an 18-golf course with clubhouse on a 157.6 acre lot located south of 208th St. and east of 46th Ave. E. in Pierce County."

### The 1991 Major Amendment

RMG first challenges the hearing examiner's 2014 decision determining that the County did not approve the original 1990 PDD/Rezone, and that any future subdivision of the golf course parcel must comply with current Rural Reserve zoning requirements. While RMG agrees that an "unclassified use permit cannot provide a zoning entitlement," it nonetheless argues that the County's subsequent approval of the 1991

-13-

major amendment allowing the 96 lot subdivision, effectively rezoned the entire original 157 acre property, including the golf course parcel, giving RMG an entitlement to develop the golf course parcel at the same density as the 96 lot subdivision.

RMG argues first that a map excerpt from Pierce County's 1995 zoning access showing an annotation of "UP9-90" along with "G" for General zoning provides "hard evidence" that UP9-90 rezoned the property. RMG's reliance on the map excerpt is misplaced for at least three reasons. First, the 1995 zoning map was not introduced before the hearing examiner during RMG's appeal of the 2014 decision determining whether the property had been rezoned. Nor did RMG argue below that the property was subject to an overlay designation. "Failure to raise issues during the course of an administrative hearing precludes consideration of such issues on review." Westside Bus. Park v. Pierce County, 100 Wn. App. 599, 608, n.5, 5 P.3d 713 (2000); Griffin v. Dep't of Soc. & Health Servs., 91 Wn.2d 616, 631, 590 P.2d 816 (1979). Thus, the 1995 zoning map is not properly before us.

Second, even if the 1995 map was properly before us, there is no evidence that the notation UP9-90 was intended to be a zoning designation or an overlay. It could just as easily have been the County's notation that the County had approved an unclassified use permit on the parcel. Without evidence or testimony establishing the County's intent with the annotation, we are left to guess. Mere theory or speculation cannot support a finding. Johnson v. Aluminum Precision Prods., 135 Wn. App. 204, 208-09, 143 P.3d 876 (2006).

Finally, and perhaps most importantly, even if the 1995 map was properly before us, RMG does not dispute that the property, including the golf course on Lot 2, was

rezoned after the County adopted its GMA comprehensive plan to rural reserve. The County's current zoning map identifies Lot 2 as zoned Rsv5—Rural Residential. Thus, even if RMG is correct and UP9-90 rezoned the property, the property was later rezoned.

RMG argues second that the County's process approving the 1991 major amendment and 96 lot subdivision was effectively a decision approving the original PDD and rezoning the entire 156 acre parcel to allow for development under the old General zoning. This argument also fails.

While RMG acknowledges that neither the staff report nor hearing examiner's 1991 decision approving the preliminary plat mention or discuss the PDD/Rezone application, it asserts that because the 1991 decision included findings necessary for approval of a PDD, the hearing examiner must have approved a PDD and rezoned the property. RMG ignores, however, that not only do neither the staff report nor the 1991 decision reference a PDD/Rezone application, but both documents specifically identify the proposal as an application "to establish a 96 lot single-family residential subdivision and single 8 foot high water tower."

RMG also ignores that the staff report set forth the inquiries and necessary findings for approval of a preliminary plat under the County's subdivision code and then identified each of the regulatory requirements necessary to address areas such as circulation, access, fire protection, storm drainage, water supply, and sewage. The hearing examiner then inquired into and found that the proposed preliminary plat would not significantly impact the environment and that, consistent with the County's subdivision division code, that "appropriate provisions by the regulatory requirements

-15-

and the conditions hereof shall provide for public health, safety and general welfare for the surrounding neighborhood." On its face, the hearing examiner's 1991 decision approved a 96 lot preliminary subdivision plat.[4] There is no basis to support RMG's assertion that the 1991 decision approved a PDD or rezoned the entire 157 acre parcel to the densities approved in the subdivision.

The hearing examiner's findings in the 2014 decision, that the 1991 decision approving the major amendment to allow the 96 lot subdivision did not approve either a PDD or rezone, are supported by substantial evidence. RCW 36.70C.130(1)(c). Further, the hearing examiner's conclusions in the 2014 decision, that RMG may apply to amend UP9-90 for the golf course parcel and seek preliminary plat approval based on the current rural reserve zoning requirements, was not an erroneous interpretation of the law. RCW 36.70C.130(1)(b).[5]

*PDD/Rezone Application*

RMG next challenges the hearing examiner's 2015 decision determining that RMG had abandoned the original 1990 PDD/Rezone application. RMG argues that there is no evidence that the application was abandoned and that the ruling on abandonment is an error of law. We disagree for two reasons.

---

[4] To the extent RMG is challenging the 1991 decision for failing to make sufficient findings or conclusion, it is too late. The well-settled doctrine of finality in Washington requires that challenges to a land use decision be raised quickly—not 23 years later. See Skamania County v. Gorge Comm'n, 144 Wn.2d 30, 49, 26 P.3d 241 (2001); Durland v. San Juan County, 182 Wn.2d 55, 60, 340 P.3d 191 (2014).

[5] RMG also argues that because the County required the UP9-90 conditions to be recorded as a covenant that it is entitled to an equitable servitude creating a zoning entitlement. The recorded covenant, however, contained the hearing examiner's conditions of approval for the golf course only and nothing about the right to residential densities that run with the land. The recorded covenant does not create a zoning entitlement.

A.   The 2015 Decision is Supported by Substantial Evidence and is not Legally Erroneous.

First, the hearing examiner's 2015 decision that the 1990 PDD/Rezone application was abandoned is based on substantial evidence and was not an erroneous application of the law.  RCW 36.70C.130(1)(b) and (c); Abbey Rd., 167 Wn.2d at 249-50.

Both RMG and the County agree that no Washington court has directly concluded when or how a land use application may expire or be abandoned.  But, as the County argues, Washington does apply the doctrine of finality as a means to encourage expeditious challenges to land use decisions.  See Skamania County v. Gorge Comm'n, 144 Wn.2d 30, 49, 26 P.3d 241 (2001); Chelan County v. Nykreim, 146 Wn.2d 904, 931-32, 52 P.3d 1 (2002); Durland v. San Juan County, 182 Wn.2d 55, 60, 340 P.3d 191 (2014).  As our Supreme Court explained in Durland, "[t]his court has faced numerous challenges to statutory time limits for appealing land use decisions and has repeatedly concluded that the rules must provide certainty, predictability, and finality for land owners and the government."  Durland, 182 Wn.2d at 60.  The hearing examiner applied this rule, concluding,

> postponing the exercise of the permit from 1990 to 2014 detrimentally impacts the public health and safety and the County's ability to implement its Comprehensive Plan and development regulations pursuant to the Growth Management Act.  Such process also violates the finality in land use matters required by our Washington Supreme Court in cases such as Chelan County v. Nykreim, et al., 146 Wn. 2d 904 (2002), and by our State Legislature in its enactment of the Land Use Petition Act (RCW 36.70C) that provides a 21 day statute of limitations to challenge a land

use decision. Predecessor needed to challenge the County's actions in 1990 if it disagreed with such.[6]

Here, the Pierce County Code requires all reviewing departments to "complete an initial review within 30 days from the application filing date." PCC 18.60.020. Under PCC 18.100.010, "the Director or Examiner shall issue a notice of final decision on a permit within 120 days, of County review time, after the Department accepts a complete application as provided in PCC 18.40.020." Finally, under RCW 36.70B.070, a local government must provide a written determination within 28 days. If, as RMG suggests, the property owners did not intend to withdraw the application, then the time to request action on the application would have been at the conclusion of these time limits. The "property owner is responsible for monitoring the time limitations and review deadlines for the application. The County shall not be responsible for maintaining a valid application." PCC 18.160.050(F). After giving due deference to the hearing examiner's construction of the law, the examiner's conclusion that an application can expire or be abandoned is not an erroneous application of the law. RCW 36.70C.130(1)(b); Abbey Rd., 167 Wn.2d at 249-50.

Further, the hearing examiner's findings that RMG and the previous owners intended to abandon this application is supported by substantial evidence. First, after LeMay submitted its PDD application in 1990, its agents met with the Department and were notified of two options. LeMay chose the quicker option, and promptly applied for an unclassified use permit for the golf course alone instead of a PDD. As LeMay's agent, Moore, testified in 1990,

---

[6] Administrative Record (AR) at 15-12.

We intended to do a PDD on the whole property, which would have included, at this hearing, the subdivision, the golf course, and an area set aside for commercial use in the future . . . retail, neighborhood commercial or something. <u>We then, through the encouragement of planning, changed into simply a UP on the golf course portion now.</u> The subdivision and any other uses will be addressed at a later time. We did talk about doing the whole 157 +/- acres; we intended to do the whole project at once. We now modified; we're simply doing the golf course today. We will be submitting at some point in the future a site plan for the subdivision and other uses.[7]

Second, in 1991, LeMay requested that the County "revive" the PDD application. In response, the County stated they would use a major amendment to the UP instead. Neither LeMay, nor any of the other property owners, contested or appealed that decision.

Third, from 1991 to 2014, the owners failed to request any information or pursue any action in furtherance of the PDD application. In 1995, Moore again stated the intent to abandon the PDD application, when he testified at a hearing that "[w]hen his golf course was in process, the planner then said he couldn't do it under a PDD, so he pulled the commercial and residential use out and submitted a UP for the golf course." Although Moore stated he was unhappy with the decision to pursue a UP instead of a PDD, he acknowledges his intent to do so.

Fourth, as the hearing examiner recognized in the 2015 decision, if RMG believed that the 1990 PDD/Rezone application was still pending, why did it pursue a legislative change to move the golf course into the UGA and rezone the property for urban densities? The documentation submitted by RMG in conjunction with its 2011 and 2013 legislative requests to be included in the UGA establish that RMG knew that

---

[7] (Emphasis added.)

-19-

the golf course was zoned Rural Reserve and that a rezone would be necessary to develop the land at higher densities.

Finally, RMG argues that this court should apply the requirements for abandonment when dealing with a nonconforming use, a standard that deals with the taking of a vested property right. Under Van Sant v. City of Everett, 69 Wn. App. 641, 647-48, 849 P.2d 1276 (1993), a City alleging abandonment of a use must show "(a) an intention to abandon; and (b) an overt act, or failure to act, which carries the implication that the owner does not claim or retain any interest in the right to the nonconforming use." Both have been shown in this case.

RMG's overt acts attempting repeatedly to pursue a legislative reclassification of the golf course into the UGA and rezone the property for urban densities, certainly support the implication that it recognized that the PDD/Rezone application had been abandoned. Further, RMG's predecessor, LeMay, demonstrated its abandonment of the PDD/Rezone application when it took full advantage of UP9-90 to develop and open the golf course, and then separately applied for and developed the 96 lot subdivision under a major amendment to UP9-90. LeMay chose to develop the property under the UP rather than rely on its original PDD/Rezone application.

Not only is there substantial evidence to support the hearing examiner's findings regarding LeMay and RMG's abandonment of the PDD/Rezone application, but LeMay and RMG's actions also demonstrate that both entities knew that the PDD/Rezone application was abandoned.

B.     The PDD/Rezone Application Was Not Vested

Second, even if the hearing examiner erred in concluding that an application could expire or be abandoned, RMG's argument still fails. RMG's argument is that its PDD/Rezone application vested and that "[t]he County cannot legally 'take away' a vested application that it has deemed complete simply by demanding an additional permit approval not originally required." Contrary to RMG's assertion, its PDD/Rezone application did not vest.

Washington's vested rights doctrine originated at common law and uses a "date certain" standard that entitles developers to have land development proposals processed under the "regulation in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations." Abbey Rd., 167 Wn.2d at 250. "By promoting a date certain vesting point, our doctrine ensures that 'new land-use ordinances do not unduly oppress development rights, thereby denying a property owner's right to due process under the law.'" Abbey Rd., 167 Wn.2d at 251 (quoting Valley View Indus. Park v. City of Redmond, 107 Wn.2d 621, 637, 733 P.2d 182 (1987)).

As our Supreme Court explained,

> [d]evelopment interests can often come at a cost to public interest. The practical effect of recognizing a vested right is to potentially sanction a new nonconforming use. "A proposed development which does not conform to newly adopted laws is, by definition, inimical to the public interest embodied in those laws." If a vested right is too easily granted, the public interest could be subverted.

Abbey Rd., 167 Wn.2d at 251 (quoting Erickson & Assocs., Inc. v. McLerran, 123 Wn.2d 864, 873-74, 872 P.2d 1090 (1994)).

-21-

While Washington's vested rights doctrine originated at common law, "the vested rights doctrine is now statutory." Town of Woodway v. Snohomish County, 180 Wn.2d 165 173, 322 P.3d 1219 (2014); Potala Vill. v. City of Kirkland, 183 Wn. App. 191, 194, 334 P.3d 1143 (2014). As such, the vested rights doctrine extends only to complete applications for building permits (RCW 19.27.095(1)); subdivisions (RCW 58.17.033(1); and development agreements (RCW 36.70B.180). Town of Woodway, 180 Wn.2d at 173. Here, because applications for a PDD or rezone are not vested by statute, the vested rights doctrine does not apply. Thus, even if the original PDD/Rezone application had not been abandoned, the application would still be subject to the current Rural Reserve zoning and not the pre-GMA General zone.

### Attorney Fees

The County requests that it be awarded its reasonable attorney fees and costs on appeal. RCW 4.84.370 provides that reasonable attorney fees and costs "shall be awarded" to the prevailing party on appeal where the prevailing party also prevailed before the local government and in superior court. Because the County prevailed before the hearing examiner and the superior court, it is entitled to an award of its reasonable attorney fees and costs for defending this appeal. Durland, 182 Wn.2d at 77-80.

No. 75401-7-I/23

Affirmed.

_____

WE CONCUR:

_____        _____